341 A.2d 896

**Anthony D. PIRILLO, Jr., Esquire, et al.**

**v.**

**Honorable Harry A. TAKIFF.**

**Anthony D. PIRILLO, Jr., Esquire, et al.**

**v.**

**Honorable Harry A. TAKIFF and Walter M. Phillips, Jr., Esquire.**

Supreme Court of Pennsylvania.

Argued Nov. 22, 1974.

Decided July 7, 1975.

Reargued Oct. 23, 1975.

512

514

Anthony D. Pirillo, Jr., Salvatore J. Cucinotta, Philadelphia, for petitioners.

Harry A. Takiff, M. L. Levy, Robert B. Lawler, Nancy J. Moore, Ben W. Joseph, Asst. Attys. Gen., Walter M. Phillips, Jr., Deputy Atty. Gen., Philadelphia, for respondents.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, and MANDERINO, JJ.

## OPINION OF THE COURT

JONES, Chief Justice.

These two petitions [1] present the novel question of whether the supervising judge of a regular grand jury conducting a special investigation may disqualify a single attorney and his associate from representing twelve witnesses subpoenaed to testify before the grand jury. We decline to issue a writ of prohibition to the supervising judge who disqualified the two attorneys/petitioners.

---

1. In No. 184 Miscellaneous Docket No. 20, Attorney Pirillo and his associate Cucinotta joined with police officers Frame and Hallman to protest Supervising Judge Takiff's order which disqualified the two lawyers from jointly representing the two policemen before the investigating grand jury. The Commonwealth subsequently withdrew the subpoenas against the co-petitioners Hallman and Frame, thus rendering that matter moot. However, Judge Takiff subsequently ruled that petitioners Pirillo and Cucinotta were similarly disqualified from representing twelve other policemen who were subpoenaed to testify before the investigating grand jury. These twelve officers, Petta, Pfeiffer, Deabler, Milewski, Kluge, Beal, Giordano, Quigley, Ward, Malaby, Corvi and Ewell, joined the two attorneys in bringing No. 214 Miscellaneous Docket No. 20 in which Walter Phillips, the Special Prosecutor, became a named respondent along with Judge Takiff.

On January 31, 1974, the Honorable Harry A. Takiff, respondent herein, charged the January 1974 Grand Jury as a special investigating grand jury to investigate, *inter alia,* corruption in the Philadelphia Police Department. On March 26, 1974, the Attorney General of Pennsylvania established the Office of the Special Prosecutor by appointing respondent Walter M. Phillips, Jr., as Deputy Attorney General to investigate and prosecute police corruption in Philadelphia. The convening of the grand jury and the appointment of the Special Prosecutor were actions taken in response to a Report by the Pennsylvania Crime Commission on Police Corruption and the Quality of Law Enforcement in Philadelphia.

In June and July of 1974, the twelve policemen/petitioners were subpoenaed to appear before the grand jury. Each officer was represented by petitioner Anthony D. Pirillo, Jr., Esquire and/or by Mr. Pirillo's associate, Salvator J. Cucinotta, Esquire.[2] As was customary, before any witness testified, Judge Takiff held an *in camera* session with the Special Prosecutor or his representative during which the Judge was informed as to the proposed scope of inquiry for these witnesses. It was revealed by the Special Prosecutor that each witness would be questioned about the conduct of other police officers, and in most cases, about the conduct of each other. Most of the officers had been named in the Crime Commission Report as persons who had taken bribes from the owners of Philadelphia bars.

Because the Special Prosecutor's office brought to Judge Takiff's attention the possibility of a conflict of interest in the multiple representation by Attorney Pirillo and his associate of all the petitioners/witnesses, the supervising judge deferred the testimony of these wit-

2. American Bar Association, Code of Professional Responsibility (adopted in this Commonwealth by Pa.R.C.P. 205) D.R. 5–105(D): "If a lawyer is required to decline employment or to withdraw from employment under D.R. 5–105, no partner or associate of his or his firm may accept or continue such employment."

nesses pending a determination of the question. After an evidentiary hearing on the conflicts matter, the judge decided that Mr. Pirillo and his associate, Mr. Cucinotta, must be disqualified from representing all twelve of the policemen/witnesses before the grand jury. His decision was based on the following grounds:

(1) The multiple representation interfered with the individual witness's right to effective counsel. For example, if witness A has information about witness B's criminal conduct, one attorney could not represent both. It may be in A's best interest for counsel to advise A to cooperate. However, this would operate to the detriment of B.

(2) The attorneys' fee compensation arrangement with the Fraternal Order of Police, by whom the petitioners/attorneys were referred and paid, constituted a serious question of conflict because of the Fraternal Order of Police's avowed public policy of strenuous opposition to any form of cooperation by individual policemen with the Special Prosecutor's office and with the investigating grand jury. This would not only interfere with the public function of the investigating grand jury but would also jeopardize the rights of the individual witnesses to effective assistance of counsel because the attorneys might be compelled to pursue the dictates of the F.O.P. which pays them rather than the best interests of the witness.

(3) There would be a serious detriment to the investigative function of the grand jury because of the multiple representation. With one attorney representing all witnesses in a particular area of investigation, the Special Prosecutor could not convince counsel to elicit cooperation of one witness since such cooperation might seriously implicate the attorneys' other clients in illegal activity.

In summary, according to the Special Prosecutor, the practical effect of the multiple representation was the

creation of the conspiratorial "stonewall" to the investigation shrouded by the interwoven attorney-client relationships.

On a Petition for Assumption of Plenary Jurisdiction, [3] for a Writ of Prohibition and for Supersedeas, we granted a rule to show cause why the Writ of Prohibition and Supersedeas should not be granted.

The extraordinary Writ of Prohibition is issued as a matter of discretion to prevent a lower court from acting outside its jurisdiction and to prevent it from abusing its discretion. *McNair's Petition,* 324 Pa. 48, 187 A. 498 (1936). It is often used where the trial judge has acted in a blatantly unlawful manner. *Commonwealth ex rel. Spector v. Shiomos,* 457 Pa. 104, 32 A. 2d 134 (1974) ; *Commonwealth v. Caplan,* 411 Pa. 563, 192 A.2d 894 (1963) ; *Schlesinger v. Musmanno,* 367 Pa. 476, 81 A.2d 316 (1951). There is the additional requirement, however, that there be an absence of other appellate remedies and the existence of extreme necessity before the writ will issue. *West Penn Power Company v. Goddard,* 460 Pa. 551, 333 A.2d 909 (J–59 filed Mar. 18, 1975) ; *Carpentertown Coal & Coke Company v. Laird,* 360 Pa. 94, 61 A.2d 426 (1948). Accordingly, where an attorney's right to pursue his occupation by representing a particular defendant is curtailed by the lower court, we have held that a writ of prohibition is an appropriate remedy where the curtailment was unlawful, there being no adequate remedy for the attorney via appeal. *Moore v. Jamieson,* 451 Pa. 299, 306 A.2d 283 (1973). Since the right to counsel is inextricably linked to the right of an attorney to practice law, the two rights

3. The Petition for Assumption of Plenary Jurisdiction is superfluous to this controversy since the Supreme Court has original, though not exclusive, jurisdiction over all cases of prohibition to courts of inferior jurisdiction. Act of 1970, July 31, P.L. 673 No. 233 art. II § 201(2), 17 P.S. § 211.201(2) (Supp.1974–75). The Rule to Show Cause was an assertion of our original jurisdiction.

are properly reviewed together. *Cf. Moore v. Jamieson, supra,* 451 Pa. at 307, 306 A.2d at 287. If, as we conclude, the rights of the petitioners were legitimately infringed upon, then the Writ of Prohibition will not issue.

## I. *Rights of the Petitioners*

In order to assess the legitimacy of the supervising judge's order, it is imperative that we assess the rights asserted and determine whether these rights may be balanced against competing state interests.

The twelve witnesses claim that the order of the supervising judge has impaired their right to counsel of their own choosing.

" . . . [U]nder the Sixth Amendment to the United States Constitution made applicable to the States through the Fourteenth Amendment, 'the accused regardless of financial status is guaranteed the right to the assistance of counsel, *either counsel of his own choosing,* or if indigent or otherwise unable to secure counsel counsel assigned by the court. *Gideon v. Wainwright* [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)].' (Emphasis added.) *Commonwealth ex rel. Goodfellow v. Rundle,* 415 Pa. 528, 533, 204 A.2d 446, 448 (1964)." (Footnote omitted.)

*Moore v. Jamieson,* 451 Pa. 299, 307, 306 A.2d 283, 288 (1973).

█ In *Commonwealth v. McCloskey,* 443 Pa. 117, 277 A.2d 764 *cert. denied,* 404 U.S. 1000, 92 S.Ct. 559, 30 L.Ed.2d 552 (1971), a witness who was to testify before the grand jury was granted the right to consult with counsel prior to and after his appearance, although the witness could not consult with counsel while in the jury room giving testimony. The witness could, however, refuse to answer a particular question and then come before the court with counsel to obtain a ruling as to whether the witness must answer the question. This

precisely defined right to counsel before the grand jury struck a balance between society's interest in the orderly inquiry process of the grand jury and the individual's Fifth and Sixth Amendment rights. It is necessarily implicit that the witnesses who are petitioners here have a right to be represented before the investigating grand jury by counsel of their own choosing.

█ In the same vein, the petitioners who are attorneys contend that they have been denied the right to pursue the practice of law. Unquestionably, the right to pursue the occupation of one's own choosing may not be curtailed without due process of law. The interest in a profession, being akin to a proper right, may not be removed arbitrarily. *Dent v. West Virginia,* 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889); *Moore v. Jamieson,* 451 Pa. at 308, 306 A.2d at 288.

█ But neither of these rights is absolute; both may be impaired or eliminated by state regulation which is designed to provide for overriding state interests or individual constitutional guarantees which are in conflict with these rights to counsel and to pursue one's profession. *United States ex rel. Carey v. Rundle,* 409 F.2d 1210 (3rd Cir. 1969); *Moore v. Jamieson,* 451 Pa. at 308–10, 306 A.2d at 288. *See Kremer v. Shoyer,* 453 Pa. 22, 37, 311 A.2d 600, 606 (1973) (Pomeroy, J., concurring).

In a third argument, the petitioners assert that the order of the supervising judge has infringed upon their freedom of speech, assembly and petition as guaranteed by the First and Fourteenth Amendments, citing *National Association for the Advancement of Colored People v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), *Brotherhood of Railway Trainmen v. Virginia,* 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), *United Mine Workers v. Illinois State Bar Association,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), and *United Trans-*

*portation Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 33 (1971).

One of the services the F.O.P. provides for its members is free representation by counsel when they are charged with a crime, questioned during a departmental investigation, or called as witnesses before an investigating grand jury. The attorney who represents the member is paid on a per hour basis by the F.O.P. The common thread running through the decisions in *Button, Trainmen, United Mine Workers* and *United Transportation Union* is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. *United Transportation Union, supra,* 401 U.S., at 585, 91 S.Ct. 1076, 28 L.Ed.2d 33. However, all four of these cases acknowledged the fact that a state may constitutionally advance substantial regulatory interests to prevent specific harm from flowing from the particular petitioners' activities, which activities justify the infringement of First Amendment rights. *Button, supra,* 371 U.S., at 444, 83 S.Ct. 328, 9 L.Ed.2d 405; *Trainmen, supra,* 377 U.S., at 8, 84 S.Ct. 1113, 12 L.Ed.2d 89; *United Mine Workers, supra,* 389 U.S. at 222–24, 88 S.Ct. 353, 19 L.Ed.2d 426; *United Transportation Union, supra,* 401 U.S., at 584, 91 S.Ct. 1076, 28 L.Ed.2d 33.

Both *Button* and *United Mine Workers* specifically addressed the issue of potential conflicts inherent in the selection of lawyers by an organization to represent individual defendants. The selection procedures discussed there were similar to the method by which the F. O.P. recommends and pays qualified attorneys to represent individual members of the Order. The United States Supreme Court recognized that a state may act pursuant to its broad power to regulate the practice of law to prevent a serious conflict of interest from arising in the legal representation of its citizens, but held that

the record below, in each instance, failed to demonstrate that any actual danger existed or that the state regulation was sufficiently narrow to meet only the particular form of danger present. The primary objectionable feature of state regulation in the First Amendment area is vagueness and overbreadth which result in sweeping and improper application of a regulation. *Commonwealth v. Dell Publications, Inc.,* 427 Pa. 189, 233 A.2d 840 (1967); *Smith v. Crumlish,* 207 Pa.Super.Ct. 516, 218 A.2d 596 (1966). Thus, if regulations affecting First Amendment rights are no greater than necessary to eliminate the substantive evil and protect the substantial governmental interests and individual rights, then the regulation can be constitutionally tolerated. *McMullen v. Wohlgemuth,* 453 Pa. 147, 308 A.2d 888 (1973).

In summary, none of the three rights asserted by petitioners are absolute ones; they may be weighed against competing state interests.

## II  *State Interests*

The history and function of a grand jury charged with a special investigation is amply detailed elsewhere. *See, e. g., Commonwealth ex rel. Camelot Detective Agency Inc. v. Specter,* 451 Pa. 370, 373–74, 303 A.2d 203, 205 (1973); *Commonwealth v. McCloskey,* 443 Pa. 117, 131–37, 277 A.2d 764, 770–74 (1971); *McNair's Petition,* 324 Pa. 48, 56–62, 187 A. 498, 502–505 (1936); *Lloyd & Carpenter's Case,* 5 Pa.L.J. 55, 3 Clark 188 (Phila.Q.S.1845). Suffice it to say that a grand jury charged with a special investigation seeks to discover past and continuing criminal acts which seriously affect or injure the public and with which normal law enforcement is unable to cope. *McNair's Petition,* 324 Pa. at 60–61, 187 A. at 504. In order to perform its function adequately, the grand jury's scope of inquiry is necessarily broad. *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

A grand jury proceeding is not an adversary hearing in which the guilt or innocence of an accused is determined. Consequently, certain constitutional and supervisory protections have been held inapplicable to the grand jury proceeding in order to facilitate the jury's quest to determine whether a crime has been committed and whether a prima facie case exists which warrants the institution of criminal proceedings. *United States v. Calandra, supra; United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Commonwealth v. McCloskey, supra.* The supervising judge sought by his order to protect the public function of the grand jury, *i. e.,* to insure that the grand jury's search for the truth in areas of alleged criminality affecting the peace and security of all persons and the Commonwealth would not be unduly impaired.

Secondly, the supervising judge cited the responsibility of the courts to protect the rights of each individual to effective counsel. There are two potential conflicts in this situation which could impair the sanctity of the attorney-client relationship. If an attorney and his associate represent more than one of the officers who have been called to testify, where, as the Special Prosecutor alleges, each officer will be called to testify as to the activity of the other officers, an impermissible conflict purportedly exists. The other potential for conflict arises from the attorney-client relationship between Pirillo and the Fraternal Order of Police, since the organization may have interests adverse to the best interests of the testifying officers.

The Sixth Amendment requires the services of a lawyer who is not obliged to serve conflicting interests. *Commonwealth ex rel. Gallagher v. Rundle,* 423 Pa. 356, 359, 223 A.2d 736, 737 (1966). *See Commonwealth v. Breaker,* 456 Pa. 341, 318 A.2d 354 (1974). We do not choose to place substantial reliance, as the supervising judge did, upon the rationale

that the order below is justified because of the multiple representation of the witnesses by a single attorney, especially since our result can be sustained on other grounds. The witnesses argue that because they have chosen the particular attorney and his associate knowing full well that the attorneys represent all of the policemen subpoenaed and because the attorneys have, as fully as possible, advised the witnesses of the potentiality of the conflicts involved, therefore the witnesses have waived their constitutional right to effective counsel. Such waiver may very well be defective on the ground that it is not a knowing and intelligent waiver; the client may not be fully and adequately informed as to the nature of the potential conflict, because, in this instance, full disclosure to the client, as required by the Code of Professional Responsibility, D.R. 5–105(C), [4] may be impossible in light of the requirements of secrecy surrounding the grand jury proceeding. But multiple representation, in and of itself, is not condemned. *Commonwealth v. Wilson*, 429 Pa. 458, 240 A.2d 498 (1968). In light of the strenuous assertions by the witnesses that they freely choose the multiple representation, we are not willing to base our result on the existence of multiple representation per se.[5]

4. D.R. 5–105(C):
   "In the situations covered by D.R. 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

5. There is another tangential consideration. The existence of multiple representation jeopardizes the time-honored concept of grand jury secrecy. Such secrecy is designed to protect the Commonwealth, the grand jurors, and the witnesses. *Commonwealth v. Kirk*, 141 Pa.Super. 123, 14 A.2d 914 (1940) *aff'd.* 340 Pa. 346, 17 A.2d 195 (1941). *Cf.* Pa.R.Crim.P. 206–208; 18 Pa.C.S. § 5103. If one of the witnesses reveals his testimony before the grand jury to his attorney, as he has every right to do, certainly the attorney will feel obliged, perhaps even subconsciously, to reveal to his other clients the testimony of the first witness. With the attorney in such a position, either the attorney-client relationship or the grand jury secrecy must suffer. Similarly, if, as will

The other potential conflict which threatens the individual rights of the witnesses to the effective assistance of counsel stems from Pirillo's representation of the Fraternal Order of Police which is not formally a party to this action or in the grand jury proceeding. The F.O.P. pays the legal fees for its members who require representation before the grand jury. The Special Prosecutor claims that, based on the F.O.P.'s history of demonstrated enmity toward investigations into police corruption, the organization has adopted a tactic of noncooperation, which tactic is inimical to the rights of any witness who might stand to gain from a strategy of cooperation with the Special Prosecutor's office. It is further alleged that such a tactic coupled with the F.O.P.'s payment of fees on behalf of the witnesses could result in a complete frustration of the grand jury's function.

The danger in a situation in which an attorney looks to a third party for his fee was recognized by the ABA Code of Professional Responsibility, now given statutory status by Pa.R.C.P. 205.[6] Throughout the investigations into police corruption conducted by the Pennsylvania Crime Commission and the June, 1972, Special Investigating Grand Jury, the F.O.P. has consistently taken the position that these investigations were a threat to its

be shown, there is an attorney-client relationship between Attorney Pirillo and the F.O.P., then Pirillo might be compelled to advise the F.O.P. as to the testimony of the several petitioner/witnesses. These revelations could be inimical to the interests of not only the Commonwealth and the grand jurors, but also to the individual witnesses themselves, all of whom are intended beneficiaries of the traditional grand jury secrecy.

6. D.R. 5–107 Avoiding Influence by Others Than the Client.
(A) Except with the consent of his client after full disclosure, a lawyer shall not:
(1) Accept compensation for his legal services from one other than his client.
(2) Accept from one other than his client any thing or value related to his representation of or his employment by his client.
(B) A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services.

members and made numerous efforts to thwart these investigations. For example, when the Crime Commission subpoenaed Police Commissioner Joseph O'Neill to testify, the F.O.P. sought to intervene and quash that subpoena on the ground that the investigation would violate the rights of police officers. *See Pennsylvania Crime Commission Subpoena,* 453 Pa. 513, 309 A.2d 401 (1973). When the Crime Commission was about to issue its report, the F.O.P. sued to enjoin publication. *Fraternal Order of Police v. Packel,* 295 Commonwealth Court Docket (1974) (dismissed with prejudice on defendant's request, Jan. 6, 1975). In addition, the F.O.P. sought to quash subpoenas issued by the June, 1972, Grand Jury. In each of these matters, the F.O.P. was represented by petitioner Pirillo. The F.O.P.'s attitude of broad noncooperation is apparently shared by respondent Pirillo, the attorney paid by the F.O.P. to represent its individual members. Thus, petitioner Pirillo testified that whenever a police officer indicated that he might consider cooperating, he would immediately remove himself as counsel and advise the witness to hire another attorney. This fee arrangement clearly has a chilling effect upon a police witness who is considering cooperation, since his access to F.O.P. paid counsel depends directly on his agreement not to cooperate. Moreover, the limited viability of the options open to a police witness suspected of illegal activity is further demonstrated by petitioner Pirillo's testimony that he would discuss the possibility of a witness cooperating only when the witness had come to him and raised the possibility. The failure of petitioner Pirillo to raise the subject of cooperation, apparently as a result of his fee arrangement with the F.O.P., deprives the witnesses of their right to the full and complete loyalty of their attorney.

The impropriety of a fee arrangement such as the one presented here and the manifest harm presented by such an arrangement both to the witnesses and to the ef-

forts of the grand jury is discussed in *In re Abrams,* 56 N.J. 271, 266 A.2d 275 (1970), a case cited and discussed by Judge Takiff in his opinion. In *Abrams,* a disciplinary proceeding, an attorney who represented a numbers writer was paid by the numbers banker. The court said:

"We . . . think it was improper for respondent to have accepted the organization's promise to pay his bill, for such an arrangement has the inherent risk of dividing an attorney's loyalty between the defendant and the gambler-employer who will pay for the services. Obviously, it is in the interest of the defendant's employer that the defendant shall not turn him in. That is why the employer is willing to pay. . . . It is of course to the advantage of the convicted defendant to seek leniency by aiding the state . . . .. It is the duty of the defendant's attorney to advise him of that opportunity. An attorney is hardly well situated to discharge that duty when he has agreed to look to the syndicate for the payment of his fee." 56 N.J. at 275–276, 266 A.2d at 278.

*Accord Salus's Case,* 321 Pa. 106, 184 A. 70 (1936).

The New Jersey Supreme Court went on to hold that the conflict of interest presented such a substantial danger both to the client and the public interest in the disclosure of crime that even the client's full knowledge and consent could not correct the impropriety of the attorney's action.

While the F.O.P. itself is not suspected of any criminal wrongdoing, it is an organization whose members are the subject of a grand jury investigation and which has taken the position that the interest of any single member in cooperating to obtain leniency must be sacrificed to the interest of the membership as a whole in obstructing any inquiry into police corruption.

We have recently stated:

"A trial judge, in the exercise of his inherent power to control litigation over which he is presiding and his duty to supervise the conduct of lawyers practicing before him so as to prevent gross impropriety, has power to act where the facts warrant it. . . . Where a breach of ethics is made to appear, the relief is usually the granting of a motion to disqualify and remove the offending lawyer, and has been employed in this State as well as other jurisdictions. See *Middleburg v. Middleburg,* 427 Pa. 114, 233 A.2d 889 (1967); *Seifert v. Dumatic Industries, Inc.,* 413 Pa. 395, 197 A.2d 454 (1964)."

*Slater v. Rimar Inc.,* 462 Pa. 138, 338 A.2d 584 (J–33 filed Apr. 18, 1975) (footnotes omitted). The test for determining whether there is an impairing conflict is probability, not certainty. *Middleburg,* 427 Pa. at 115, 233 A.2d at 890; *Seifert,* 413 Pa. at 398, 197 A.2d at 455. A court is not bound to sit back and wait for a probability to ripen into a certainty; it may restrain conduct which has the potential for evolving into a breach of ethics before such conduct becomes ripe for disciplinary action. *Slater v. Rimar Inc., supra; Cf. Kremer v. Shoyer, supra; Middleburg v. Middleburg, supra.*

### III. *Balancing of Competing Interests*

In balancing the conflicting rights of the state and the petitioners, four considerations dominate the weighing process:

"(1) Whether the state interest[s] sought to be achieved can be effectively accomplished in some manner which will not infringe upon interests protected by constitutional rights; (2) Whether the state interest[s] [are] sufficiently compelling when compared with the interests affected, [to justify] any infringement of those interests; (3) Whether the state inter-

est[s] [are] sufficiently compelling to justify the degree of infringement that is necessary to effectuate that interest; (4) Whether the provision under challenge represents the narrowest possible infringement consistent with effectuating the state interest involved." *Moore v. Jamieson,* 451 Pa. 299, 310–11, 306 A.2d 283, 289 (1973).

None of the petitioners have suggested alternative means by which the interests of the state may be protected without the concomitant infringement upon the petitioners' individual rights. Nor are we able to conjure any plan other than the one ordered by the supervising judge which would adequately protect the various state interests threatened by the multiple representation.

Furthermore, the interests of the state are sufficiently compelling to justify appropriately tailored infringements of constitutional rights. We have earlier pointed out that each right asserted by petitioners is susceptible to curtailment. We have also endeavored to demonstrate that the state interests are sufficiently strong to justify some incursion upon the rights invoked by petitioners. The court in its supervisory capacity over the grand jury must be alert to prevent as far as possible any abridgment of that body's function which is to investigate public wrongs and to bring indictments for the protection of society. The secrecy surrounding grand jury proceedings is a mechanism to insure the safety and reputation of witnesses and grand jurors. The historical and statutory power of courts to regulate the legal profession is one which is inherent in the power to oversee the administration of justice. Surely this power serves the interest of all citizens of the Commonwealth to be secure against the actions of attorneys subservient to clients with competing interests.

The degree of infringement in this instance is especially justified in light of the limited scope of the su-

pervising judge's order, and the problems which are sought to be prevented. The pertinent part of the judge's order read as follows:

> "The Petition to Remove . . . Anthony D. Pirillo, Jr., Esquire, and his associate, Salvatore J. Cucinotta, Esquire, as counsel is GRANTED. The respective witnesses . . . are hereby ordered that if they wish private counsel they shall forthwith proceed to engage separate counsel for such purpose in accordance with the foregoing Opinion or, in the event their economic circumstances require it, to make timely application to the Court for a determination of eligibility and Court Appointment of Counsel."

The Opinion makes it clear that in no event may any witness hire an F.O.P.-related attorney. To hold otherwise would allow the witnesses to recreate albeit perhaps to a lesser degree the conflict sought to be eradicated. The order, however, pertains only to the conduct of the grand jury investigation. Recourse to F.O.P. lawyers in other legal matters is not restricted. There is no deterrence or chilling effect on the political expression of the F.O.P. and no smothering of discussion of common interests to its members or disruption of F.O.P. efforts to initiate and defend legal matters or to provide legal service to its members save in this single proceeding.

It is also manifest in the order of the supervising judge that no two of the subpoenaed witnesses who are parties to this petition may be represented by the same counsel. This portion of the order is essential to secure the secrecy of the grand jury proceeding. We do not mean to imply that multiple representation will never be tolerated at the grand jury level. Here, however, where each witness was a potential defendant, and the Court received information that the testimony of each officer might be expected to incriminate one or more of the other witnesses, and where the extent of the possible

multiple cross-involvement in criminal activity is known to the Court but hidden from the individual witnesses by the requirements of secrecy, it is inappropriate for the supervising judge to permit multiple representation.

Attorneys Pirillo and Cucinotta are not suspended from the practice of law, formally disciplined, or precluded from representing the F.O.P. or any of its members in other litigation. They are, however, precluded from representing the twelve witnesses in this proceeding. Because of their relationship with the F.O.P., it would be improper to allow them to represent even one of the witnesses since the attorney-client relationship between the attorneys and the F.O.P. presents a serious danger that the attorney-client relationship with even one witness would be impaired.

In short, the degree of infringement resulting from the supervising judge's order is the minimum necessary to insure the state interest while at the same time the infringement is justified by the scope of the state interests and the extent of harm which is sought to be prevented.

The Petition for Assumption of Plenary Jurisdiction, Writ of Prohibition and Supersedeas at No. 184 Miscellaneous Docket No. 20 is denied as being moot.[7] In No. 214 Miscellaneous Docket No. 20, the Petition for Assumption of Plenary Jurisdiction, Writ of Prohibition and Supersedeas is denied.

NIX, J., did not participate in the consideration or decision of this case.

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice (dissenting).

I dissent. The twelve witnesses in this case have knowingly, intelligently, and voluntarily chosen to be represented by the two attorneys who are the petitioners.

7. See footnote 1, supra.

The majority's decision, denying the witnesses their choice of attorneys, is rooted in a presumption that the witnesses are guilty of crimes, even though there is not one shred of evidence in this record to warrant such a conclusion, and even though under state and federal law, the witnesses must be presumed innocent—not guilty. I cannot agree with the novel proposition that the *state* can deprive a citizen of his right to be represented by the attorney of his choice by speculating that he may be guilty.