Orlo G. McCoy, M.D., Petitioner *v.* Commonwealth of Pennsylvania, State Board of Medical Education and Licensure, Respondent,

Argued June 7, 1978, before President Judge Bow-man and Judges Crumlish, Jr., Wilkinson, Jr., Mencer, Rogers, Blatt and DiSalle.

*Fred Speaker,* with him *Pepper, Hamilton & Scheetz,* for petitioner.

*Donald J. Murphy,* Deputy Attorney General, and *Guy J. DePasquale,* Deputy Attorney General, with them, *Paul J. Carey, Jr.,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for respondent.

*Angelo Skarlatos,* for amicus curiae, The Keystone Podiatry Society of Pennsylvania.

OPINION BY JUDGE WILKINSON, JR., September 14, 1978:

The issue before us is the constitutionality of the mandatory insurance provisions of the Health Care Services Malpractice Act (Act)[1] under the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution and Article III, Section 32, of the Pennsylvania Constitution. At issue is an order of the State Board of Medical Education and Licensure (Board) which suspended the license of petitioner, a practicing physician, pursuant to Section 701(a) of the Act, until such time as he has complied with the provisions of the Act. For the reasons set forth herein we find Section 701(a) constitutional and therefore affirm the action of the Board.

---

[1] Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §1301.101 et seq.

The challenged section provides:

(a) Every health care provider as defined in this act, practicing medicine or podiatry or otherwise providing health care services in the Commonwealth shall insure his professional liability or provide proof of self insurance in accordance with this section.

Section 701(a) of the Act, 40 P.S. §1301.701(a).

534

In 1974, jurisdictions throughout the United States were confronted with what was popularly referred to as a "medical malpractice crisis" evidenced by precipitous increases in malpractice claims and awards, concurrent and equally precipitous increases in the cost of malpractice insurance and the threatened unavailability of such insurance at any cost.[2] The Pennsylvania General Assembly responded to this "crisis" by enacting the Act. Its stated purpose is "to make available professional liability insurance at a reason-

---

[2] See, Note, *Medical Malpractice—A Question of Insurability*, 80 Dick. L. Rev. 594 (1976).

As evidence of the national scope of the problem, all states with the exception of Montana have within the past two years adopted medical malpractice legislation. The statutes may be divided into four general legislative schemes: (1) those such as Pennsylvania's which limit the liability of insurers by the creation of a fund from which excess payments for damages over a specified ceiling are to be paid; (2) those limiting the damages recoverable in malpractice actions and providing for compulsory arbitration of claims; (3) those revising the statute of limitations in malpractice actions; and (4) those requiring insurers to provide professional liability insurance as a condition of doing business in the state. *See generally* White & McKenna, *Constitutionality of Recent Malpractice Legislation*, 13 Forum 312 (1977). Compulsory insurance provisions have been enacted in statutes of the first category which, in addition to Pennsylvania, include Alaska, Idaho, Kansas, Kentucky and North Dakota. *See* Alaska Stat. §08.64.215; Idaho Code §§39-4206, 3904208, 3904209; Kan. Stat. §40-3402; Ky. Rev. Stat. Ann. §304.40-330; N.D. Cent. Code §26-40.01. The compulsory insurance provisions have been upheld in constitutional challenges in two states. *See Kansas ex rel. Schneider v. Liggett*, Kan. , 576 P.2d 221 (1978); *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied*, 431 U.S. 914 (1977). In Kentucky, the statutory mandate was declared in violation of the equal protection clause of the Kentucky Constitution. *McGuffey v. Hall*, 557 S.W. 2d 401 (Ky. 1977). In North Dakota, a district court found that state's statute denied equal protection to a physician who was required but unable to obtain insurance. *Arneson v. Olson*, Civil No. 26309 (4th Dist.—Burleigh County, Filed December 15, 1977).

able cost and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation."[3] It implements this policy by establishing an arbitration system whereby claims against health care providers[4] are initially heard[5] and by limiting the dollar amount of liability of insurers on individual awards.[6] This limitation on liability is achieved by the creation of a "Medical Professional Liability Catastrophe Loss Fund" [hereinafter referred to as the Fund], established by a surcharge on insurance premiums or direct assessment by self-insurers.[7] The Fund is guaranteed by requiring that all health care providers as defined by the Act either purchase insurance or develop a plan of self-insurance[8] and by making insurance available to high risk health care providers through a Joint Underwriting Association.[9] The state licensure boards are required to suspend or revoke the license of a health care provider upon a failure to comply with the mandatory insurance provisions or to participate in the Fund.[10]

Petitioner, a practicing physician in Canton, Pennsylvania, licensed to practice medicine in this state since 1941, was cited by the Board on November 30, 1976 for failure to comply with the provisions of the

[3] Section 102 of the Act, 40 P.S. §1301.102.

[4] Section 103 of the Act, 40 P.S. §1301.103, defines a "health care provider" as "physician, an osteopathic physician or surgeon, a podiatrist, hospital [or] nursing home. . . ."

[5] See Sections 301 to 514 of the Act. 40 P.S. §§1301.301-1301.514.

[6] Section 701(b) of the Act, 40 P.S. §1301.701(b).

[7] Section 701(d) of the Act, 40 P.S. §1301.701(d).

[8] Section 701(a) of the Act, 40 P.S. §1301.701(a).

[9] See Sections 801 to 810 of the Act, 40 P.S. §§1301.801-1301.810.

[10] Section 701(f) of the Act, 40 P.S. §1301.701(f).

Act in (1) failing to secure professional liability insurance or to submit an approved self-insurance plan and (2) failing to pay the 10 per cent surcharge into the Fund. At a hearing held on December 9, 1976, petitioner told the Board that he did not have and did not intend to acquire professional liability insurance and that he had not and did not intend to contribute to the Fund. His sole defense to the Board's citation was the unconstitutionality of the Act.[11] Accordingly, the Board on April 28, 1977 ordered petitioner's license suspended. On May 4, 1977, the Board issued a stay pending a determination by this Court.[12]

Preliminarily, we must note the parameters of our review where a state statute is attacked on allegations of substantive constitutional infirmities.

'It is the province of the legislature, not the judiciary . . . to determine the means necessary to combat' public problems, for with means as with ends, 'the legislature, which is more responsive to the people and has more adequate facilities for gathering and assembling the requisite data, is in a better position to evaluate and determine' alternative approaches. Basehore [v. Hampden Industrial Development Au-

---

[11] Ronald Bachman, director of financial affairs for the Pennsylvania Medical Society also testified in behalf of petitioner. Bachman testified that current costs for insurance by Pennsylvania physicians ranged from $736 to $13,580 annually with Argonaut Insurance Company and $988 to $18,180 annually through the Joint Underwriting Association. Petitioner appears to raise some argument by the mere recitation of these statistics that the statutory requirement is unreasonable. However, absent some showing in the record, or facts not apparent to us at this time, we are unable to say that requiring health care providers to bear the cost of such insurance is per se unreasonable.

[12] In addition to the detailed briefs of petitioner and respondent, this Court also had the benefit of an amicus brief submitted by the Keystone Podiatry Society of Pennsylvania.

*thority,* 433 Pa. 40,] at 49, 248 A.2d [212,] at 217 [(1968)]; see also Johnson v. Pennsylvania Housing Finance Agency, 453 Pa. 329, 337-38, 309 A.2d 528, 533 (1973). Our inquiry is limited to a determination of whether the means selected are so 'demonstrably irrelevant to the . policy the legislature is free to adopt' as to be arbitrary and irrational. (Footnote omitted.)·

*Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 9, 331 A.2d 198, 202 (1975).

And, in distinguishing due process and equal protection standards under the United States Constitution, we begin with the general observation that in considering the due process clause we are concerned with the fundamental fairness of the State's dealing with an individual while in considering the equal protection clause we evaluate the disparity of treatment by the state between classes of individuals whose situations are arguably indistinguishable. *Ross v. Moffitt,* 417 U.S. 600 (1974).

### Due Process

Petitioner contends that the statutory requirement of mandatory insurance is unreasonable and unrelated to the objectives sought to be achieved by the Act and therefore violates his right to substantive due process guaranteed by the Fourteenth Amendment. Further, he argues, assuming the validity of the mandatory insurance provision, that enforcement by suspension or revocation of his license to practice medicine is likewise violative of due process as unreasonable and unrelated to the object of the legislation.

It is well established that a state may regulate professions, consistent with the substantive due process right of an individual to pursue the occupation of his choosing, so long as the matters regulated affect the public interest. *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896 (1975), *cert. denied,* 423 U.S. 1083

(1976) ; *Adler v. Montefiore Hospital Association,* 453
Pa. 60, 311 A.2d 634 (1973), *cert. denied,* 414 U.S. 1131
(1974) ; *State Board of Podiatry Examiners v. Lerner,*
213 Pa. Superior Ct. 63, 245 A.2d 669 (1968). Where
such regulations are attacked, substantive due process
requires:

> [A] law which purports to be an exercise of
> the police power must not be unreasonable, un-
> duly oppressive or patently beyond the necessi-
> ties of the case, and the means which it employs
> must have a real and substantial relation to the
> objects sought to be attained. Under the guise
> of protecting the public interests the legislature
> may not arbitrarily interfere with private busi-
> ness or impose unusual and unnecessary re-
> strictions upon lawful occupations.

*Gambone v. Commonwealth,* 375 Pa. 547, 551, 101 A.
2d 634, 637 (1954).

Certainly it cannot be gainsaid that health care pro-
viders, in particular the medical profession, stand in
the forefront of guardians of the public health and
welfare.

Thus, we do not doubt the authority of the state
to recognize the problem of malpractice insurance
availability and to deal with it. It is no answer to
say the petitioner had no claims made against him
during the course of his career. In framing its poli-
cy the legislature was not bound to provide for deter-
minations of the relative proficiency of particular
health care providers. The legislature was entitled
to consider the general effects of the unavailability
of malpractice insurance and, if these effects were
injurious, to counteract them by a general rule, even
though as applied to particular practitioners there
might be no evidence of need for the legislative regu-
lation. *See Semler v. Oregon State Board of Dental
Examiners,* 294 U.S. 608 (1935).

Testing Section 701(a) of the Act against these principles of substantive due process, we cannot conclude that requiring professional liability insurance is wholly unreasonable and arbitrary and bears no rational relation to the public's interest in assuring the compensability of malpractice claims. Petitioner's holistic approach to the statute as aimed simply at making malpractice insurance available, glosses over the myriad and complex factors that gave rise to the malpractice crisis that confronted the legislature and which petitioner candidly admits was the reason for the legislation. This view also ignores the interrelated nature of the entire statute, a full reading of which discloses that mandatory insurance is inextricably tied to the creation and maintenance of the Catastrophe Loss Fund, the legislative quid pro quo to insurance companies' continuing to provide malpractice insurance coverage in Pennsylvania. Moreover, the 10 per cent surcharge on insurance premiums by which the health care provider's contribution is determined roughly relates to the degree of risk (and thus the health care provider's direct interest in the maintenance of the Fund). If health care providers could elect not to participate in contributing to the Fund, it takes no special knowledge of logic or human nature to conclude that "low risk" health care providers would withdraw, leaving the Fund to be financed by "high risk" insureds and almost inevitably assuring its depletion. Without the Fund which allows insurers to establish an actuarial basis for anticipation of needed reserves, insurers might again find malpractice an uninsurable risk and either drastically curtail or withdraw totally from participating in the market, in short, creating conditions for precisely the same "crisis" the legislation was designed to obviate. Therefore, we find, within the words of the statute itself, a real and demonstrable relation between the

requirement of insurance, or proof of financial responsibility, and the object of the legislation to make malpractice insurance available to all health care providers. Similarly, we find the public has an interest in providing that malpractice insurance be available not only to assure compensability for claims but also to protect those who provide medical services in the state from the threat of financial ruin.

We do not understand petitioner's due process argument that the penalty of suspension of his license to practice medicine is too harsh. If it is proper to require him to obtain insurance, then what other penalty would be appropriate?

### EQUAL PROTECTION

In considering whether Section 701(a) of the Act denies the petitioner equal protection of the laws[13] in violation of the Fourteenth Amendment, we are initially confronted with choosing the appropriate standard, that is, the rational basis test where the constitutionality of the statute is presumed or the strict scrutiny test where the state's creation of a classification places special burdens on a suspect class or impinges on a fundamental liberty so that the state must come forward with compelling reasons for its classification. *See San Antonio School District v. Rodriguez*, 411 U.S. 1 (1973). Petitioner invites this Court to examine the demands of the equal protection clause under the standards of strict scrutiny alleging infringement of a fundamental right to practice medi-

---

[13] The issues raised under equal protection were also alleged violative of Article III, §32 of the Pennsylvania Constitution. Since the content of these two provisions are not significantly different, these issues will be considered together. *Baltimore & Ohio Railroad Co. v. Department of Labor and Industry*, 461 Pa. 68, 334 A.2d 636 (1975).

cine.[14]  This we cannot do.  The Supreme Court of the United States has made it clear that in order for the strict scrutiny standard to apply, the fundamental right must be explicitly or implicitly guaranteed by the Constitution. *San Antonio School District, supra.* In equal protection challenges to state limitations on employment opportunities and state licensing, the Court has consistently applied the rational basis test in determining the constitutionality of the state's classification. *See, e.g., Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307 (1976); *New Orleans v. Dukes,* 427 U.S. 297 (1976); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483 (1955). These cases recognize that there is no fundamental right to employment in general or the practice of medicine in particular. *Shaw v. Hospital Authority of Cobb County,* 507 F.2d 625 (5th Cir. 1975); *Liggett, supra* note 2. Thus, we deem the proper standard to be applied is whether the classification bears some rational relationship to a permissible state objective. *Dandridge v. Williams,* 397 U.S. 471 (1970).

In this context, petitioner argues that Section 701 (a) fails to meet the standard because the health care providers who are subject to the mandatory provisions of the Act are a legislatively created class whose

---

[14] At oral argument petitioner also asserted that the right of his patients to be treated by the physician of their own choosing was also being infringed. Petitioner asserts that this "right" is one of the personal rights reserved to the people under the Ninth Amendment of the United States Constitution and that therefore this Court must apply the strict scrutiny test. *Griswold v. Connecticut,* 381 U.S. 479 (1965). Apart from the substantial question of standing this issue raises, there has been no allegation the statute impairs or infringes upon the physician-patient relationship. *See Adler, supra.* To require insurance coverage and participation in the Fund is not to deny the physician the right to treat his patient or the corresponding right of a patient to choose his own physician.

definition has no rational relationship to the avowed purposes of the Act. Section 103 of the Act defines the health care provider subject to Section 701(a) as "a physician, an osteopathic physician or surgeon, a podiatrist, hospital [or] nursing home." The classification thus excludes other state licensees who provide health care services, such as nurses, chiropractors and dentists, who are also subject to malpractice claims, but are not subject to the provisions of the Act. This statutory scheme of exclusion and inclusion, petitioner argues, evidences a classification that is wholly arbitrary with no obvious rational relationship to the Act's stated objective.

Where a statutory classification is attacked for its under-inclusiveness, the Supreme Court has observed,

[T]his Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. . . . Legislatures may implement their program step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. (Citations omitted.)

*New Orleans v. Dukes, supra* at 303; *see also Williamson, supra.*

The equal protection clause does not require that the state must choose between attacking every aspect of the problem or not attacking the problem at all. *Dandridge, supra.* The constitutional safeguard is offended only if the classification rests on grounds wholly unrelated to the state's objective. *McGowan v. Maryland,* 366 U.S. 420 (1961); *Adler, supra.* Finally, the fact that a state might have achieved its underlying purpose more artfully or more completely does not warrant the conclusion that the method it chose was unconstitutional. *Singer v. Sheppard,* 33 Pa. Commonwealth Ct. 276, 381 A.2d 1007 (1978).

Within this constitutional framework, we turn to an examination of the statute and its stated objectives, to make professional liability insurance available at a reasonable cost and to establish a system to assure compensation for justified claims. The studies of malpractice legislation nationwide indicates the availability of insurance and increasing costs for insurance was most critical for physicians, hospitals and nursing homes; moreover, studies indicated other health care providers were able to acquire insurance at acceptable rates. *See generally Forum, supra.* Therefore, there is a basis to support the legislature's conclusion that the exclusion of other health care professionals did in fact rest upon a ground of difference that bore a fair and substantial relationship to the object of the legislation. *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (1975).

Absent a factual showing by petitioner, who had the burden of showing unconstitutionality under the rational relationship test, that physicians, hospitals and nursing homes bore the cost of professional liability insurance when in fact the risk involved, as shown by actual claims, involved health care providers other than this class, we fail to see how petitioner could have been treated unfairly by the classification.

Accordingly, we will enter the following

### ORDER

AND Now, September 14, 1978, the order of the State Board of Medical Education and Licensure dated April 28, 1977, suspending the license of Orlo C. McCoy, M.D., until he has complied with the provisions of the Health Care Services Act, is hereby affirmed.

544

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. In *Gambone v. Commonwealth,* 375 Pa. 547, 550-52, 101 A.2d 634, 636-37 (1954), former Chief Justice STERN succinctly stated:

> Probably the most important function of government is the exercise of the police power for the purpose of preserving the public health, safety and morals, and it is true that, to accomplish that purpose, the legislature may limit the enjoyment of personal liberty and property. It is also true, as stated in Commonwealth v. Zasloff, 338 Pa. 457, 460, 13 A.2d 67, 69, that the police power has been juridically extended to many fields of social and economic welfare. But, as likewise there stated, the power is not unrestricted; its exercise, like that of all other governmental powers, is subject to constitutional limitations and judicial review. By a host of authorities, Federal and State alike, it has been held that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts. (Footnotes omitted.)

Testing the provision of the Health Care Services Malpractice Act (Act) here in question[1] which requires, *inter alia*, a physician to insure his professional liability or provide proof of self-insurance, I cannot but conclude that such a requirement, in view of the proclaimed purposes of the Act, is unreasonable and arbitrary and bears no rational relation to public health, safety, morals, or welfare.

> Unquestionably, the right to pursue the occupation of one's own choosing may not be curtailed without due process of law. The interest in a profession, being akin to a proper[ty] right, may not be removed arbitrarily.

*Pirillo v. Takiff*, 462 Pa. 511, 521, 341 A.2d 896, 900 (1975), *reinstated*, 466 Pa. 187, 352 A.2d 11 (1976), *cert. denied*, 423 U.S. 1083 (1976).

If the Legislature meant what it said about the purposes of the Act, and if the anticipated results were in fact more insurance at less cost, then, indeed, compulsory insurance was an unnecessary restriction upon the practice of medicine.

Section 102 of the Act, 40 P.S. §1301.102, sets forth the purposes to be attained by the Act:

> It is the purpose of this act to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and

---

[1] Section 701(a) of the Act of October 15, 1975, P.L. 390, *as amended*. 40 P.S. §1301.701(a). Section 701(a) provides:

(a) Every health care provider as defined in this act, practicing medicine or podiatry or otherwise providing health care services in the Commonwealth shall insure his professional liability or provide proof of self-insurance in accordance with this section.

the determination of fair and reasonable compensation.

The requirement that those health care providers covered by the Act carry private malpractice insurance or be self-insured under regulations adopted by the Insurance Commissioner has no legislative relationship to the purpose section of the Act. Nowhere is there a legislative finding that judgments against health care providers had been going unsatisfied, or that valid suits had not been brought because the defendants had neither insurance coverage nor sufficient assets. I agree with the following portions of the amicus curiae brief filed by The Keystone Podiatry Society of Pennsylvania:

Contradictorily, the Legislature requires every health care provider to obtain a liability insurance policy while it specifically recognizes that such insurance is so expensive and so difficult or impossible to obtain that the Act itself is necessary.

Quite simply, the objectives to be met are stated unequivocally in Section 102 of the Act. The Legislature meant to create a stable insurance market with reasonable rates so that health care providers could obtain insurance coverage at an affordable price. The Legislature also meant to hasten and simplify the adjudicatory process of medical malpractice claims, and to strengthen the regulatory effectiveness of the appropriate Boards.

The Statutory Construction Act of 1972, Act of December 6, 1972, P.L. 1339, No. 290, 1 Pa. C.S. §1501 et seq., is clear on how legislative intent is to be determined. Section 1924 thereof provides in pertinent part: 'The title and preamble of a statute may be considered in the construction thereof.' (Preambles are now usu-

ally placed in a 'policy' or 'purpose' section such as Section 102 of the Act.)

Furthermore, Section 1921(b) thereof states, 'When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the *pretext* of pursuing its spirit.' (Emphasis added.) A strong choice of words indeed from one governmental branch to another!

Then, in the very next subsection, the Legislature gave its imprimatur to judicial pursuits of legislative spirit only '[w]hen the words of a statute are *not* explicit. . . .' (Emphasis added.) Section 1921(c) continues with a list of matters which may not be considered if the words of the statute are clear and free from all ambiguity.

A careful reading of Section 102 of the Act, which *is* clear, unambiguous, and explicit, reveals that there is no discernable intent on the part of the Legislature to deal with any problem which compulsory insurance could remedy. The problem was *getting* the insurance, not *not* getting it. . . .

. . . .

In summary, the compulsory insurance requirement of Section 701(a) bears no reasonable relationship to the objectives sought to be attained by the Malpractice Act.

. . . .

In other words, it was not necessary to guarantee the insurance companies a market for their product in order to keep them in Pennsylvania. The companies did not need, nor were they interested in, such a boon. In fact they were not interested in the Pennsylvania mar-

ket at all. *The task was to get them to stay despite their belief that the risk was no longer insurable.*

. . . .

Given this state of affairs, it is obvious that it would serve no useful purpose to try to persuade insurance companies to stay in Pennsylvania by guaranteeing them customers—most companies wanted no part of the market in any event. Health care providers just would not be willing to pay high enough premiums to justify the risk.

Again, would compulsory insurance have halted the exodus of insurers? Plainly, no. The following descriptions of the situation facing the Legislature in 1975 condemns the requirement as a superfluity:

'It was clear both to doctors' representatives and to insurance carriers that the recent history of claim payments would compel any prudent insurer to insist upon very large premium increases. Probably it was also foreseen that any increase that the carriers would consider as even minimally adequate would be unacceptable to the doctors. But whatever the anticipation, medical spokesmen wasted little time haggling over the details of premiums and proceeded directly to the heart of the matter, the liability rules responsible for the insurers' losses.

'Legislators soon found that under existing liability rules there was no chance of finding premium rates acceptable to both doctors and insurers. A legislature had to choose between a protracted struggle with doctors and insurance companies to keep

health care available, under continuing threat of job actions by doctors and withdrawal of malpractice coverage by the insurers, *and changing the legal arrangements governing malpractice litigation.*' Reder, 'Medical Malpractice: An Economist's View,' Amer. Bar Foun. Res. J. 511, 515 (1976) (Emphasis added).

'It was clear that the problem involved more than the charging of exorbitant rates to produce excessive profits. If the medical malpractice insurance business were a profit-making one, companies would be entering, rather than abandoning, the field. Pennsylvania's legislature was not alone in its consideration of why malpractice insurance, unlike other types, is not a profitable business.

'The answer to this question is that medical malpractice was an uninsurable risk with which private companies had become unable to deal. The legislature, thus, faced the task of either coping with the risk as such or attempting to make it an insurable one.' Note, 'Medical Malpractice—A Question of Insurability,' [80 Dick. L.R. 594, 595 (1976)].

A cursory glance of the Act's Table of Contents reveals that the Legislature made the risk an insurable one by means of fundamental changes in malpractice litigation and by limiting an individual insurer's liability.

. . . .

So, one must conclude that the Legislature either misconceived the problem (it didn't), or simply overkilled it. The latter in fact occurred —coercion (compulsory insurance) backed by

a threat (suspension or revocation of license in Section 701(f)) was utilized when only economic persuasion and changes in litigation methods were necessary.

This of course is not a phenomenon of democracy, but only a natural and quite unwitting violation by a harried body of individuals anxiously seeking to remedy one of many problems.

Nevertheless, 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' NAACP v. Alabama, 377 U.S. 288, 307 (1969). (Emphasis in original.)

We need to keep in mind that protection to patients who may be harmed as a result of medical malpractice is *not* the problem this kind of legislation is intended to solve. Likewise, we need to ask ourselves just how a scarce commodity (malpractice insurance) is to be rendered any less scarce by requiring every eligible party to buy it. *See McGuffey v. Hall*, 557 S.W. 2d 401 (Ky. 1977). In *McGuffey*, in an opinion reaching a conclusion that a Kentucky statute similar to the one here under consideration was constitutionally defective, we find the following language which is pertinent to testing the constitutionality of our Act by the principles of constitutional law enunciated, at the outset of this opinion, by former Chief Justice STERN:

§1 of the Act states in substance that its purpose is to promote the health and general welfare of the general citizenry through adopting reforms in medical malpractice claims, establishing the Fund so as to increase the availability and lower the cost of medical malprac-

tice insurance, and assuring that medical malpractice judgments and settlements will be satisfied. Conceding, therefore, that the payment of malpractice claims is within the stated purposes of the Act, still it does not appear to have any reasonable relationship to the problem stated in the preamble or to any other problem or threatened problem shown to exist. Is there, for example, any problem or threatened problem in the form of unsatisfied claims against doctors and hospitals? Not to our knowledge. If not, and especially when the legislature has not suggested that there is, must its existence be presumed from the bare circumstance that the legislature has acted on the subject? We do not think so. The police power does have limits.

'It is fundamental that such [an] extraordinary power is not without limitation, for it may not operate unreasonably beyond the occasion or necessity of the case. It may not unreasonably invade private rights and thus violate those rights guaranteed under either the Federal or the State Constitution. . . . The exercise of the power must have a substantial basis and cannot be made a mere pretext for actions that do not come within its scope. To state it another way, the action of the government may not arbitrarily invade liberty or property rights under the guise of police regulation.' Bond Bros. v. Louisville & Jefferson County Met. S. Dist., 307 Ky. 689, 211 S.W. 2d 867, 872 (1948).

'It is true that legislative bodies possess what the opinions designate as "the primary authority" to determine whether or not the particular enactment is justified under authority conferred by the Police Power. Therefore,

when the law-making department has so determined the rule is, that the courts should hesitate to declare otherwise.

'But the power of the courts to so declare is not thereby denied or taken away. In determining such questions judicial knowledge may be consulted and relied on, and if from that knowledge, or any other source, it appears that the grounds upon which the legislature based its action are arbitrary and unfounded in fact it is not only the right but the duty of courts to say so and declare the consequences.' City of Louisville v. Kuhn, 284 Ky. 684, 145 S.W. 2d 851, 854 (1940).

'The rule is that, in order to sustain legislative interference with the business of the citizen, by virtue of the police power, the act or ordinance must have some reasonable relation to the subjects included in such power. If it is claimed that the statute or ordinance is referable to the police power, the court must be able to see that it tends in some degree towards the prevention of offenses, or the preservation of the public health, morals, safety, or welfare. It must be apparent that some such end is the one actually intended, and that there is some connection between the provisions of the law and such purpose. If it is manifest that the statute or ordinance has no such object, but, under the guise of the police regulation, is an invasion of the property rights of the citizen, it is the duty of the court to declare it void.' Tolliver v. Blizzard, 143 Ky. 773, 137 S.W. 509, 510-511, 34 L.R.A. (NS) 890 (1911).

'Moreover, the law must tend toward the accomplishment or promotion of the enumerated objects in a degree that is perceptible and

clear.' Schoo v. Rose, Ky., 270 S.W. 2d 940, 941 (1954).

*Id.* at 412-13.

I am certain that the majority and I are in agreement that the practice of medicine is a lawful, honorable, and necessary profession which is properly subject to state regulation. Yet I find it totally unreasonable to impose upon this class of health care providers the responsibility for curing the ills recognized in the purpose section of the Act, without an attendant finding of responsibility for such ills.

I would hearken to Dr. McCoy's clarion protestation that, absent a showing that physicians or other health care providers are financially irresponsible or unwilling to satisfy claims made against them, the requirement of maintenance of insurance upon penalty of loss of license is unreasonable and violative of the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Pennsylvania Constitution.[2]

Judge CRUMLISH, JR., joins in this dissent.

---

[2] Article I, Section 1 of the Pennsylvania Constitution reads:
    All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

---

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I must respectfully dissent because the constitutional issue raised by this case demands an expression of my views which the majority opinion does not resolve. It is apparent that at this appellate level, a sharp difference exists in the interpretation of the Health Care Services Malpractice Act (Act).

The enactment of the Health Care Services Malpractice Act to remedy the alleged "Medical Malpractice Crisis" is a classic example of a qualified success. The legislature may boast of performing a successful operation on the medical profession and its clientele because it can now assure reasonable insurance rates and a more efficient adjudicatory process. That success, unfortunately, however, is afforded at the expense of the livelihood of several practitioners. The cure afforded by the Act is so overwhelming that it has injured many of those it intended to help. Its regulations are unduly prohibitive to both small practitioners, such as Appellant, and new practitioners who neither have the financial wherewithall to meet its requirements nor the clientele able to sustain higher medical costs and, in my judgment, the requirements of the Act result in an unconstitutional infringement of Appellant's right to work. *See Secretary of Revenue v. John's Vending Corp.*, 453 Pa. 488, 309 A. 2d 358 (1973). The right to work is no longer a mere privilege; it is now a property right in its fullest measure. Once it is certified that a person is qualified to practice a profession, his right to do so should remain unfettered and unhampered until it is established that because of either misconduct or moral, physical or professional ineptitude, he is not fit to perform his duties. Financial security has never been a condition precedent to the practice of medicine, or any other profession, and to impose such a condition constitutes an unreasonable restriction of a property right resulting in an unconstitutional deprivation of property. Because the Act requires each and every practitioner to both purchase insurance and pay a surcharge into a Catastrophe Loss Fund as a condition to continued practice, it is, in my judgment, unconstitutional.

Moreover, the Act's establishment of the Catastrophe Loss Fund to be drawn on by practitioners whose limits of insured liability is exceeded by an insurance award indisputably encourages claimants to seek awards greater in sum than would otherwise be available and, in effect, constitutes an absolute indemnity against any injury sustained in any and all amounts and circumstances. The Fund virtually eliminates the risk to be taken by insurance companies and places it on individual practitioners, and entices enterprising individuals energized by ingenious jury presentations to seek windfall gains. Consequent increased insurance premiums beyond the reach of the insured are inevitable. Equally inevitable are higher medical costs to those who can least afford them. For these reasons, I conclude, as did Judge MENCER, that the Health Care Services Malpractice Act is unconstitutional.