756 A.2d 1172

Charles DELLENBAUGH, Administrator of
the Estate of Dora M. Dellenbaugh

v.

COMMONWEALTH of Pennsylvania MEDICAL PROFESSION-
AL LIABILITY CATASTROPHE LOSS FUND and Pennsyl-
vania Medical Society Liability Insurance Company.

Appeal of Medical Professional Liability
Catastrophe Loss Fund.

Supreme Court of Pennsylvania.

Submitted April 12, 2000.

Decided Aug. 22, 2000.

William H. Lamb, Guy A. Donatelli, Lamb, Windle & McErlane, West Chester, for CAT Fund.

William S. Schweers, Jr., Harrington Schweers Datillo & McClelland, Canonsburg, for Dellenbaughs.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

This is an appeal from a memorandum decision of Commonwealth Court[1] which held that the appellant, Medical Professional Liability Catastrophe Loss Fund (CAT Fund),

---

1. This case was addressed to Commonwealth Court's original jurisdiction; hence, appellate jurisdiction is governed by 42 Pa.C.S. § 723(a).

560

an agency of the Commonwealth, is responsible for providing statutory excess liability coverage in a medical malpractice action against a surgeon, Arturo Azurin, M.D. The background of the case is as follows.

On January 13, 1993, Dr. Azurin performed abdominal surgery on Dora M. Dellenbaugh. Following the surgery, serious complications developed. These included an uncontrollable infection, respiratory distress syndrome, and arterial thrombosis that necessitated an above-the-knee amputation. As a result, Dellenbaugh was forced to remain in in-patient care and her death ensued in August of the same year.

Appellee, Charles Dellenbaugh, as administrator of his wife's estate, filed this malpractice action against Dr. Azurin. It is uncontested that damages could exceed the $200,000 of basic coverage that Dr. Azurin maintains through his primary insurance carrier, Pennsylvania Medical Society Liability Insurance Company (PMSLIC). The CAT Fund, in accordance with its statutory function, normally provides excess coverage for such claims. See Health Care Services Malpractice Act (Malpractice Act), 40 P.S. §§ 1301.701–1301.706. The fund notified appellee, however, that it would not provide coverage in this case. The basis for the CAT Fund's action was that, beginning in January of 1992, Dr. Azurin failed to pay his required annual surcharges to the fund. Pursuant to the Malpractice Act, such surcharges are assessed against health care providers in the Commonwealth to provide funding for the CAT Fund. See 40 P.S. § 1301.701(e) (assessment of annual surcharge). The surcharges are normally collected by one's primary insurance carrier, which, in turn, remits them to the fund.

The CAT Fund was notified by PMSLIC, via letter dated June 2, 1992, that Dr. Azurin had not paid his annual surcharge. The penalty for failure to pay an annual surcharge to the fund is suspension or revocation of the delinquent health care provider's license by the state licensure board. 40 P.S. § 1301.701(f). It is the responsibility of the fund's director to notify the applicable licensure board when a health care provider fails to comply with the surcharge requirement. 31

Pa.Code § 242.17(a) ("The failure of the health care provider to comply ... will result in notification by the Director to the applicable Licensure Board."). With regard to Dr. Azurin's failure to pay the surcharge, however, the director failed to provide notification to the Board of Professional and Occupational Affairs, State Board of Medicine (licensure board). Hence, proceedings to suspend or revoke Dr. Azurin's license to practice medicine did not promptly commence.[2] In January of 1993, therefore, when Dr. Azurin performed surgery on Dellenbaugh, his failure to pay CAT Fund surcharges had not been brought to the attention of the licensure board.

With regard to the CAT Fund's liability for payment of damage awards in cases where health care providers fail to comply with surcharge requirements, it is specified in 31 Pa.Code § 242.17(b) that:

A health care provider failing to pay the surcharge or emergency surcharge within the time limits prescribed will not be covered by the Fund in the event of loss.

Based on this, the CAT Fund denied liability for any damage award arising from Dr. Azurin's alleged malpractice.

On July 7, 1997, appellee filed a petition for review in Commonwealth Court seeking a declaratory judgment that the CAT Fund was estopped from denying statutory excess coverage by virtue of its failure to have promptly reported Dr. Azurin to the licensure board for failing to pay his annual surcharge. Commonwealth Court held that the fund cannot deny coverage. It reasoned that one of the central purposes of the Malpractice Act is to provide fair and reasonable compensation for persons injured by medical malpractice.

Commonwealth Court concluded that the Malpractice Act was intended to assure compensation for tort victims regardless of whether surcharges have been paid by the health care provider. It reasoned that although 31 Pa.Code § 242.17(b), supra, provides that a doctor who fails to pay a surcharge is not covered by the fund in the event of loss, the fact that the

2. Proceedings were not commenced by the licensure board until July 6, 1995, and, ten months later, on May 6, 1996, Dr. Azurin's license to practice medicine was revoked.

doctor is not covered does not mean that the fund is not responsible for payment of damages to a victim of malpractice. The court viewed 31 Pa.Code § 242.17(a), supra, as creating a duty for the fund to protect potential victims of malpractice by providing expeditious notice to licensure boards when health care providers fail to pay their annual surcharges. It held, therefore, that appellee could maintain a claim against the fund and that the fund was estopped from denying coverage. We disagree and accordingly reverse.

The purpose of the Malpractice Act was set forth in 40 P.S. § 1301.102, which provides:

It is the purpose of this act to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation.

While the second of the stated purposes is indeed to promote the "determination of fair and reasonable compensation" for tort victims, 40 P.S. § 1301.102, supra, the other purpose, to wit, the one deemphasized by the decision below even though it was the one set forth first in the statutory description of purposes, is to "make available professional liability insurance at a reasonable cost," id. It is inherently contrary to the latter purpose to require the fund to cover claims made against those who have not paid their surcharges to the fund, for, by doing so, the fund would be required to increase surcharges assessed against compliant health care providers. It would also undermine the financial integrity of the fund to pay claims for those who have ignored their responsibility to pay into the fund. We do not believe that the legislature intended such a result.

■ The Malpractice Act provides that "the fund shall be funded by the levying of an annual surcharge on or after January 1 of every year on *all* health care providers entitled to participate in the fund." 40 P.S. § 1301.701(e)(1) (emphasis

added). Inasmuch as all providers are required to pay the surcharges, the clear and logical implication is that if a provider fails to pay his share, he may not participate in the coverage offered by the fund. Accordingly, the CAT Fund promulgated the regulation at 31 Pa.Code § 242.17(b), supra, which states that a health care provider who fails to pay CAT Fund surcharges "will not be covered by the Fund in the event of loss." See generally *Tool Sales & Service Co. v. Commonwealth*, 536 Pa. 10, 22, 637 A.2d 607, 613 (1993) (agencies are accorded deference in interpreting the statutes they enforce).

■ To conclude that a provider can ignore the requirements of the Malpractice Act, yet reap the benefits thereof, is untenable. Further, when an insured is not covered for a loss, it is inconceivable that the claimant is nevertheless entitled to be paid by the carrier for that loss. The court below, by holding the CAT Fund liable for such a loss, plainly erred.

We are not persuaded by Commonwealth Court's suggestion that the CAT Fund could pay the loss and then pursue Dr. Azurin to recoup any damages that the fund pays to appellee. This would further drain assets of the fund where the likelihood of recovering such funds is low, and resources of the fund would have to be used to cover the costs of collection. We note, too, that recourse against Dr. Azurin personally is just as available to appellee as it is to the CAT Fund.

■ Nor do we agree with Commonwealth Court's determination that the CAT Fund is estopped from asserting its non-liability by reason of its failure to have promptly notified the licensure board regarding Dr. Azurin's failure to pay surcharges to the fund. Commonwealth Court relied on its own decision in *Central Dauphin School District v. Commonwealth*, 63 Pa.Cmwlth. 48, 437 A.2d 527, 530 (1981) for the proposition that equitable estoppel can apply to a Commonwealth agency when the agency intentionally or negligently misrepresents some material fact, with knowledge or having reason to know that another would justifiably rely on that misrepresentation, and where the other is induced to act to his

detriment because of the justifiable reliance. The court's opinion offers virtually no explanation, however, of how the principles of estoppel apply to the facts of this case. The court may have reasoned that failure to have notified the licensure board amounted to a misrepresentation, and that this resulted in Dellenbaugh being subjected to surgery by Dr. Azurin, to wit, surgery that would not have been performed if the fund had complied with its notification requirements. This rationale is not clearly set forth, but it is by implication the basis for the application of estoppel.

Without regard to whether anything that could be deemed a misrepresentation occurred,[3] however, estoppel was not appropriately invoked. There is nothing in the record to suggest that, if the fund had promptly notified the licensure board regarding Dr. Azurin's failure to pay surcharges, the surgery on Dellenbaugh would not have been performed. If the fund had notified the board in June of 1992 when it first became aware of Dr. Azurin's failure to pay, Dr. Azurin's license would not likely have been suspended or revoked before surgery was performed on Dellenbaugh in January of 1993. Thus, Dellenbaugh was not harmed by the fund's lack of prompt notification to the licensure board.

The fund itself has no power to suspend or revoke a license; rather, such sanctions can be applied only "by the licensure board." 40 P.S. § 1301.701(f). The sanctions are not invoked immediately upon the board's receipt of notice from the fund. Rather, notification to the board merely sets in motion a process by which the license can be suspended or revoked. The process affords full procedural due process safeguards. These include notice, hearings, a decision by a hearing examiner, and review by the licensure board. See 40 P.S. § 1301.901–1301.905.

As the CAT Fund alleged in its "Answer and New Matter" filed in response to appellee's petition for review in Common-

---

3. It is not alleged that there were ever any communications between the CAT Fund and Dellenbaugh. The fund argues, therefore, that no misrepresentation could have occurred, and that Dellenbaugh placed no reliance on the fund.

wealth Court, "even if the CAT Fund had reported Dr. Azurin to the licensure board upon learning that he had not paid his 1992 surcharge, Dr. Azurin's license would not have been suspended or revoked by January of 1993." Appellee offered no response to this pleading. On appeal, appellee's brief concedes that "it is impossible to know with certainty what would have occurred," but asserts that "[I]t is certainly *possible* that some suspension *could* have occurred before the surgery in question." (Emphasis added). Appellee cites nothing in the record to support this assertion. Indeed, the only indication in the record as to the speed with which the licensure board acts is contrary to appellee's position. After proceedings were initiated against Dr. Azurin on July 6, 1995, his license was not revoked until May 6, 1996. Hence, the process took ten months. Such extended proceedings, had they been commenced in June of 1992, would have been of no benefit to Dellenbaugh in January of 1993 since Dr. Azurin's license would not yet have been revoked.

We conclude, therefore, that it was error for the court below to hold that the CAT Fund is liable for excess liability coverage where the doctor has not paid the required surcharges, and that it was error to hold that the fund is estopped from denying coverage.

Order reversed.

Justice NIGRO files a dissenting opinion in which Justice SAYLOR joins.

NIGRO, Justice, dissenting.

I would affirm the Commonwealth Court, as I believe that the plain language of the Malpractice Act requires the CAT Fund to provide statutory excess coverage in the underlying malpractice action against Dr. Azurin, regardless of the CAT Fund's regulation to the contrary. Accordingly, I respectfully dissent.

As noted by the majority, 40 P.S. § 1301.102 sets forth the dual purposes of the Malpractice Act. First, Section 1301.102 makes clear that the Malpractice Act is intended to make

professional liability insurance available at a reasonable cost. In addition, but no less importantly, Section 1301.102 indicates that the Malpractice Act is intended to establish and maintain a system whereby persons injured by the torts and/or breaches of contract of their health care providers can obtain a prompt adjudication of their claims and a determination of fair and reasonable compensation. In order to achieve its dual purposes, Section 1301.701(d) of the Malpractice Act provides for the creation of:

a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider **entitled to participate in the fund** as a consequence of any claim for professional liability ... to the extent such health care provider's share exceeds its basic insurance coverage.

40 P.S. § 1301.701(d) (emphasis added).[1] Thus, the legislature determined that the dual purposes underlying the Malpractice Act would be best served by the creation of a contingency fund providing statutory excess coverage to any and all health care providers who, according to the terms of the Malpractice Act, are "entitled to participate in the fund." In my view, the relevant question therefore becomes whether or not, pursuant to the terms of the Malpractice Act, Dr. Azurin's entitlement to participate in the fund as of the date that he operated on Dora M. Dellenbaugh was conditioned upon his payment of the CAT Fund's annual surcharge for that year.

As the following discussion indicates, based on the plain language of several of the provisions contained in the Malpractice Act, it is clear that health care providers' entitlement to participate in the fund is not conditioned on their payment of the annual surcharge. Therefore, I believe that the CAT

1. It bears noting that some three years after Dr. Azurin operated on Dora M. Dellenbaugh in 1993, the legislature amended 40 P.S. § 1301.701. Act of Nov. 26, 1996, P.L. 776, No. 135, § 3, imd. effective. However, none of the language contained in Section 1301.701 that is cited in this dissenting opinion was affected in any way by the 1996 amendment. Accordingly, I believe that the disposition of the instant appeal would remain the same under both the present version of Section 1301.701 and the previous version of the section that was in effect as of the date of Dora M. Dellenbaugh's surgery.

Fund's regulation relied upon by the majority in reversing the Commonwealth Court, 31 Pa.Code § 242.17(b), which indicates that statutory excess coverage is conditioned on payment of the annual surcharge, is not in accord with the plain language of the Malpractice Act, and should not be deferred to.

Citing Section 1301.701(e)(1) of the Malpractice Act, the majority asserts that all health care providers are required to pay the CAT Fund's annual surcharge, and from that point, educes that "the clear and logical implication is that if a provider fails to pay his share, he may not participate in the coverage offered by the fund." My analysis leads to the conclusion that the majority is incorrect.

First, the majority incorrectly asserts that all health care providers are required to pay the annual surcharge. Section 1301.701(e)(1) of the Malpractice Act provides that "the fund shall be funded by the levying of an annual surcharge on or after January 1 of every year on all health care providers **entitled to participate in the fund.**" 40 P.S. § 1301.701(e)(1) (emphasis added). Thus, the annual surcharge is only levied against those health care providers who are "entitled to participate in the fund." In addition, the plain language of the Malpractice Act indicates that health care providers' entitlement to statutory excess coverage from the CAT Fund is not conditioned on payment of the annual surcharge. Pursuant to 40 P.S. § 1301.701(a)(1)(i), health care providers who conduct 50% or more of their health care business or practice within the Commonwealth of Pennsylvania and who annually insure or self-insure their professional liability at least in the amounts specified therein "shall be entitled to participate in the fund." As noted above, Section 1301.701(d) provides, in no uncertain terms, that the CAT Fund was created for the express purpose of "paying all awards, judgments and settlements for loss or damages against a health care provider **entitled to participate in the fund** ... to the extent such health care provider's share exceeds its basic coverage insurance." 40 P.S. § 1301.701(d) (emphasis added). Therefore, construing Section 1301.701(a)(1)(i) and Section 1301.701(d) in *pari materia* with one another, as we must pursuant to

Section 1932 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1932, it becomes clear that health care providers need only conduct at least 50% of their health care business within the Commonwealth and maintain certain statutorily-set amounts of primary professional liability insurance coverage in order to be entitled to statutory excess coverage from the CAT Fund.[2]

However, as noted by the majority, the CAT Fund has promulgated a regulation interpreting the terms of the Malpractice Act at 31 Pa.Code § 242.17(b), which provides that a health care provider's failure to pay the annual surcharge will result in the loss of statutory excess coverage. In addition, the majority correctly asserts that administrative agencies such as the CAT Fund are entitled to deference when they interpret the statutes that they enforce. *See generally Tool Sales & Serv. Co., Inc. v. Commonwealth of Pennsylvania, Bd. of Fin. and Revenue*, 536 Pa. 10, 22, 637 A.2d 607, 613 (1993). Nevertheless, the validity of an administrative agency's interpretive regulation depends "upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute that it interprets." *Pennsylvania Human Relations Comm'n v. Uniontown Area Sch. Dist.*, 455 Pa. 52, 77, 313 A.2d 156, 169 (1973). Given the plain language of the Malpractice Act indicating that entitlement to CAT Fund statutory excess coverage is not conditioned on payment of the annual surcharge, I would find that the CAT Fund's regulation to the contrary, 31 Pa.Code § 242.17(b), does not track the meaning of the Malpractice Act and thus, should not be deferred to.

**2.** 40 P.S. § 1301.701(e), when considered in *pari materia* with Section 1301.701(a)(1)(i), provides further support for the conclusion that the Malpractice Act does not condition statutory excess coverage on payment of the annual surcharge. If the legislature intended to condition statutory excess coverage on payment of the annual surcharge, then it could have easily added payment of the surcharge to the dual requirements for entitlement to participate in the fund set forth in Section 1301.701(a)(1)(i). It did not, and instead saw fit to levy the annual surcharge against health care providers who were already entitled to statutory excess coverage (i.e., "entitled to participate in the fund"). 40 P.S. § 1301.701(e).

By way of reiteration, I believe that the plain language of the Malpractice Act dictates that a health care provider's entitlement to statutory excess coverage from the CAT Fund is conditioned only on meeting the in-state practice and primary insurance requirements set forth in 40 P.S. § 1301.701(a)(1)(i). In its brief to this Court, the CAT Fund does not argue, much less point to any evidence of record indicating that Dr. Azurin conducted less than 50% of his health care practice in the Commonwealth of Pennsylvania or that he failed to maintain the minimum amounts of primary professional liability insurance coverage required by the Malpractice Act at any time relevant to the underlying malpractice action against him. Therefore, all indications are that Dr. Azurin was "entitled to participate in the fund" pursuant to 40 P.S. § 1301.701(a)(1)(i) at all times relevant to the underlying malpractice action. Accordingly, I believe that the CAT Fund should be required to provide statutory excess coverage in the underlying malpractice action against Dr. Azurin despite the fact that he failed to pay his annual surcharge.[3,4]

Justice SAYLOR joins in the dissenting opinion.

**3.** The majority finds such a result inconceivable, most likely out of a legitimate concern for the continuing financial viability of the CAT Fund if health care providers are not required to pay their annual surcharges in order to enjoy statutory excess coverage. However, the majority fails to recognize that there is already a strong safeguard built into the Malpractice Act to protect against abuse by health care providers seeking to obtain statutory excess coverage without paying their annual surcharges. Section 1301.701(f) of the Malpractice Act provides that:

[t]he failure of any health care provider to comply with any of the provisions of this section or any of the rules and regulations issued by the director shall result in the suspension or revocation of the health care provider's license by the licensure board.

40 P.S. § 1301.701(f). Thus, while health care providers such as Dr. Azurin who fail to pay their annual surcharges will not lose their statutory excess coverage immediately, they will have their professional licenses revoked by the appropriate licensure board, at which point they will inevitably lose their status as health care providers under the Malpractice Act. In fact, that is exactly what happened to Dr. Azurin, whose license to practice medicine was revoked after the State Board of Medicine was notified by the CAT Fund of his failure to pay his annual surcharges commencing in January of 1992. In addition, such a result is fully consistent with the dual purposes of the Malpractice Act, since it

helps to ensure the availability of fair and just compensation for persons injured by the torts and/or breaches of contract of their health care providers while protecting the continued financial viability of the fund, which helps to make professional liability insurance available to health care providers at a reasonable cost.

4. As a final aside, it bears noting that although Dr. Azurin's primary professional liability insurance carrier, PMSLIC, informed the CAT Fund by letter dated June 2, 1992 of Dr. Azurin's failure to pay his annual CAT Fund surcharge for 1992, the CAT Fund made no effort to notify the State Board of Medicine of Dr. Azurin's delinquency until January of 1993. Thus, for reasons still unclear from the record, the CAT Fund failed to act for some six months before complying with the dictates of its own regulation at 31 Pa.Code § 242.17(a), which provides that "[t]he failure of a health care provider to comply with section 701 of the act (40 P.S. § 1301.701) ... will result in notification by the Director to the applicable Licensure Board." In my view, the simple fact that the CAT Fund knew of Dr. Azurin's failure to comply with the surcharge provisions of the Malpractice Act for some six months before reporting it to the State Board of Medicine is inexcusable, regardless of whether or not a prompt notification would have resulted in the revocation of Dr. Azurin's license to practice medicine before he operated on Dora M. Dellenbaugh.