863 A.2d 487

**Lorraine PATERNASTER, Administratrix of the
Estate of Damon Paternaster, Appellant,**

v.

**Dong P. LEE, M.D., and the Commonwealth of Pennsylvania
Medical Professional Liability Catastrophe Loss Fund,
Appellees.**

Supreme Court of Pennsylvania.

Argued May 11, 2004.

Decided Dec. 22, 2004.

Kenneth Dean Chestek, Erie, for Lorraine Paternaster.

Guy Anthony Donatelli, Maureen McBride, West Chester, for Com. of PA, Medical Professional Liability Catastrophe Loss Fund.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION OF THE COURT*

Justice NIGRO.

Appellant Lorraine Paternaster, as administratrix for the estate of Damon Paternaster, appeals from the order of the

Commonwealth Court denying her motion for summary judgment and granting the motion for summary judgment filed by Appellee, the Commonwealth of Pennsylvania Medical Professional Liability Catastrophe Loss Fund (the "CAT Fund"). For the reasons that follow, we affirm the Commonwealth Court's order.

In late 1986, Damon Paternaster visited Appellee Dong P. Lee, M.D., seeking medical treatment to gain weight. Dr. Lee prescribed Mr. Paternaster andrenocortical steroids, which he took until May 1997, when he allegedly stopped because he was experiencing negative side effects. Several years later, Mr. Paternaster apparently began suffering medical problems and he attributed those problems to his prior use of the steroids that Dr. Lee had prescribed.

Notably, when Dr. Lee treated Mr. Paternaster in 1986 and 1987, he was a licensed physician in Pennsylvania and carried a primary professional liability insurance policy in the amount required by the Health Care Services Malpractice Act (the "Act"), Act of October 15, 1975, P.L. 390, No. 111 (as amended 40 P.S. § 1301.701–1301.1006) (superseded).[1,2] This primary policy, however, was a "claims" policy, which only provided coverage for claims filed while Dr. Lee held the policy, rather than an "occurrence" policy, which would have covered claims relating to any acts that occurred while he held the policy regardless of when the claims were filed. In late 1987, Dr.

---

1. On March 20, 2002, the Act was superseded by the Medical Care Availability and Reduction of Error Act ("MCARE Act"), Act of March 20, 2002, P.L. 154, No. 13 (40 P.S. § 1303.101–1303.910). The MCARE Act created a new fund, the Medical Care Availability and Reduction of Error Fund ("MCARE Fund"), to replace the CAT Fund. *See* 40 P.S. § 1303.712(a). The MCARE Act, however, did not extinguish any of the liabilities of the CAT Fund, but instead transferred those liabilities to the MCARE Fund. *See id.* § 1303.712(b). Therefore, in determining the liability of the MCARE Fund, we must consider whether the CAT Fund was liable to Mr. Paternaster under the previous, now repealed, provisions of the Act. Moreover, for the sake of clarity, we shall simply refer to "the Act" and "the CAT Fund" throughout this opinion, rather than referring to the MCARE Act and the MCARE Fund.

2. During the time Dr. Lee treated Mr. Paternaster, he also paid the annual surcharges for CAT Fund coverage. *See* 40 P.S. § 1301.701(e).

Lee let his primary claims policy lapse. Moreover, Dr. Lee did not purchase a "tail" policy, which would have provided coverage for claims filed after his claims policy lapsed if the claims related to acts that occurred while he had the claims policy.[3]

In early 1994, Dr. Lee moved to Korea. Shortly thereafter, on May 19, 1994, Mr. Paternaster filed a writ of summons against Dr. Lee. As Mr. Paternaster could not personally serve Dr. Lee in Korea, he ultimately served him by publication and mail in September 1994. On December 22, 1994, Mr. Paternaster wrote a letter to the CAT Fund, advising it that he had instituted an action against Dr. Lee based on Dr. Lee's treatment of him in 1986 and 1987, and requesting information about Dr. Lee's primary insurance coverage. In reply, the CAT Fund notified Mr. Paternaster that his claims were not covered by Dr. Lee's primary insurance policy or, for that matter, by the CAT Fund. On January 9, 1995, Mr. Paternaster wrote a second letter to the CAT Fund stating that he disagreed with its finding that it was not responsible for covering his claims against Dr. Lee. Furthermore, Mr. Paternaster demanded that the CAT Fund appoint counsel to defend Dr. Lee.

On April 26, 1995, Mr. Paternaster filed a complaint against Dr. Lee, alleging that Dr. Lee had committed medical malpractice while treating him. Dr. Lee did not respond to Mr. Paternaster's complaint, and therefore, on May 26, 1995, Mr. Paternaster sought a default judgment against Dr. Lee. The trial court subsequently entered the requested default judgment in the amount of $1,432,525 (the "Default Judgment"). Mr. Paternaster then filed a writ for execution on the Default Judgment against both Dr. Lee and the CAT Fund, as garnishee of the judgment, in the Erie County trial court. Mr. Paternaster also issued interrogatories in aid of execution to the CAT Fund.

The CAT Fund responded to Mr. Paternaster's writ of execution by filing both an election of optional venue in the

3. Thus, in essence, the tail policy would have converted his claims policy into an occurrence policy.

Dauphin County trial court,[4] and preliminary objections, challenging the trial court's jurisdiction over the action and arguing that it was not liable for the Default Judgment as a garnishee because it was not holding any assets on Dr. Lee's behalf. Furthermore, on March 22, 2002, the CAT Fund filed an answer to Mr. Paternaster's interrogatories as well as a new matter, in which it asserted that it was not responsible for indemnifying Dr. Lee with regard to the Default Judgment because: (1) it had not received proper notice regarding its duty to defend and indemnify Dr. Lee; and (2) Dr. Lee was not covered by a primary insurance policy for Mr. Paternaster's claims, and such coverage was necessary for CAT Fund coverage to apply under the Act.

On April 4, 2002, based on a stipulation of the parties, the trial court transferred the case to the Commonwealth Court. Thereafter, both parties filed motions for summary judgment.[5] In its motion, the CAT Fund reasserted the argument it made in its preliminary objections that it could not be held liable as a garnishee as well as the two arguments it raised in its new matter. Mr. Paternaster responded to these arguments in his motion, arguing that: (1) the CAT Fund was liable for the Default Judgment as a garnishee because it had a statutory duty to defend and indemnify Dr. Lee for the claim; (2) he had sufficiently notified the CAT Fund of its duty to defend and indemnify Dr. Lee in his December 1994 and January 1995 letters; and (3) the Act required the CAT Fund to provide occurrence-type coverage and therefore, where a health care provider, such as Dr. Lee, had primary policy in place at the time of an alleged wrongful act, the CAT Fund

4.  Pennsylvania Rule of Civil Procedure provides that when a writ of execution is filed in one county on a garnishee that is located in a different county, the garnishee may elect to respond to the writ in the county in which the garnishee is located. See Pa.R.C.P. 3141(b). Accordingly, the CAT Fund filed an election of optional venue in the Dauphin County trial court because its principal office is located in Dauphin County.

5.  The Court scheduled argument on the CAT Fund's Preliminary Objections and New Matter, but later cancelled the argument, stating that the parties apparently expected to resolve the matter through summary judgment motions.

was required to cover a claim relating to that act even if, at the time the claim was filed, the provider no longer had a primary policy to cover the claim.

On October 4, 2002, Senior Judge Warren G. Morgan of the Commonwealth Court granted the CAT Fund's summary judgment motion and denied Mr. Paternaster's motion. Specifically, Judge Morgan found that the CAT Fund was not responsible for covering claims against a health care provider, such as Dr. Lee, who had failed to obtain a tail policy to secure primary insurance to cover the claims. Judge Morgan explained that there was nothing in the Act which "expressly or impliedly authorize[d] the CAT Fund to pay toward a claim under these circumstances," and further pointed out that 31 Pa.Code § 242.7, a regulation adopted by the director of the CAT Fund, explicitly stated that the CAT Fund was not responsible for paying a claim under these circumstances. Furthermore, quoting from this Court's decision in *Dellenbaugh v. CAT Fund*, 562 Pa. 558, 756 A.2d 1172 (2000), Judge Morgan reasoned that "when an insured is not covered for a loss, it is inconceivable that the claimant is nevertheless entitled to be paid by the carrier for that loss." *Paternaster v. Lee*, No. 209 M.D.2002, at 3 (Aug. 19, 2002) (quoting *Dellenbaugh*, 756 A.2d at 1175). While Judge Morgan recognized that his conclusion "may leave a successful malpractice claimant without recourse to any malpractice coverage," he stated that unless the General Assembly amended the Act to provide a claimant with relief under these circumstances, the courts were without power to grant any such relief. *Id.* at 3–4. As he ruled in the CAT Fund's favor on this basis, Judge Morgan did not address the CAT Fund's claims that it could not be held responsible for the judgment as a garnishee and that it did not receive proper notice of its responsibility to cover Mr. Paternaster's claims.

In her appeal to this Court, Appellant Lorraine Paternaster argues that the Commonwealth Court erred in finding that the CAT Fund was not responsible for indemnifying Dr. Lee with regard to the Default Judgment because according to the Act, the CAT Fund was required to provide coverage to a health

care provider who maintained the appropriate level of primary insurance at the time of the alleged malpractice and Dr. Lee indisputably had the appropriate amount of primary insurance when he allegedly mistreated Mr. Paternaster.[6] However, we disagree with Appellant that the Act required the CAT Fund to indemnify Dr. Lee under these circumstances and consequently, we affirm the Commonwealth Court's order.

In 1975, the General Assembly passed the Act to respond to a national " 'medical malpractice crisis' evidenced by precipitous increases in malpractice claims and awards, concurrent and equally precipitous increases in the cost of malpractice insurance and the threatened unavailability of such insurance at any cost." *McCoy, M.D. v. Bd. of Medical Education and Licensure,* 37 Pa.Cmwlth. 530, 391 A.2d 723, 725 (1978). Specifically, to reduce the financial pressures that large jury awards placed on primary carriers and doctors, the Act created the CAT Fund, which was designed as:

> a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider entitled to participate in the fund as a consequence of any claim for professional liability brought against such health care provider as a defendant or an additional defendant to the extent such health care provider's share exceeds its basic coverage insurance in effect at the time of the occurrence as provided in subsection (a)(1).

40 P.S. § 1301.701(1)(d) (repealed). However, the Act made clear that not every claim or award against a health care provider who practiced in the Commonwealth would give rise to CAT Fund coverage as, for example, no coverage would be provided to health care providers who did not conduct "more than 50% of [their] health care business or practice within the Commonwealth" or who did not maintain a minimum level of primary insurance per occurrence and per year. *See id.* § 1301.701(1)(i)-(iii) (repealed); *see also id.* § 1301.701(2)(i) (repealed) (a health care provider who conducts 50% or less of

---

**6.** During the pendency of the resolution of the summary judgment motions, Mr..Paternaster died and his widow, Lorraine, was substituted on his behalf.

its health care business or practice in the Commonwealth shall not be entitled to participate in the Fund); *McCoy*, 391 A.2d at 726 (CAT Fund does not cover awards, judgments, or settlements against health care providers who failed to obtain the minimum level of primary insurance required by the Act.)

While there was nothing in the Act itself that explicitly required health care providers to obtain a specific type of primary policy, *i.e.*, a claims policy or an occurrence policy, in order to qualify for CAT Fund coverage, section 1301.807 of the Act did require that insurers providing claims policies to health care providers guarantee that additional insurance protection be made available to those providers after their claims policies expire.[7] *See id.* §§ 1301.701(a), 1301.807 (repealed). Moreover, the CAT Fund director enacted regulations, which specify that a health care provider who purchases a claims policy must also purchase a tail or similar type of policy upon the expiration of his claim policy to maintain CAT Fund coverage for claims concerning alleged acts of malpractice during the period that the provider had the claims policy, but filed after the claims policy expired. Specifically, 31 Pa.Code § 242.2 states that "[i]n the case of a claims made policy permitted under sections 103 and 807 of the act (40 P.S. §§ 1301.103 and 1301.807), the insurance requirements of the act require purchase of the reporting endorsement (that is, tail coverage) or prior acts coverage or its substantial equivalent by the health care provider, upon cancellation or termination of the claims made policy." 31 Pa.Code § 242.2. In addition, 31 Pa.Code § 242.7(a)(2) provides:

---

7. Section 1301.807 specifically provided as follows:

The Insurance Commissioner shall not approve a policy written on a claims made basis by any insurer doing business in this Commonwealth unless such insurer shall guarantee to the commissioner the continued availability of suitable liability protection for health care providers subsequent to the discontinuance of professional practice by the health care provider or the sooner termination of the insurance policy by the insurer or the health care provider for so long as there is a reasonable probability of a claim for injury for which the health care provider may be held liable.

40 P.S. § 1301.807.

Cancellation or renewal of claims made coverage resulting from the request of the insured or the cancellation or nonrenewal by the insurer without the purchase of the reporting endorsement, prior acts coverage or its substantial equivalent *automatically releases the Fund from liability for claims for injuries or death from services which were rendered or which should have been rendered by the health care provider which occur or which are reported to the basic insurance carrier after the effective date of cancellation or nonrenewal.*

*Id.* § 242.7(a)(2) (emphasis added). Similarly, 31 Pa.Code § 242.17(d)(2) indicates that where a health care provider cancels a claims policy and fails to purchase prior acts coverage or its equivalent upon the cancellation, the CAT Fund will be relieved of its responsibility to act as a primary insurer pursuant to 40 P.S. § 1301.605, *see infra* n. 8. *See* 31 Pa.Code § 242.17(d)(2).

■ Although Appellant recognizes that the above regulations indicate that the CAT Fund is not responsible for covering Mr. Paternaster's Default Judgment against Dr. Lee, Appellant asserts that those regulations are unenforceable because the director of the CAT Fund did not have the authority to enact such regulations. In the first instance, Appellant argues that the CAT Fund director lacked the authority to enact 31 Pa.Code §§ 242.2, 242.7(a)(2), and 242.17(d)(2) because the director only has the authority to adopt regulations on specific matters of procedure and these regulations concern substantive matters rather than procedural ones. Appellant further contends that the CAT Fund director did not have the authority to enact sections 242.2, 242.7(a)(2), and 242.17(d)(2) because these regulations are not consistent with the Act.

As Appellant acknowledges, section 506 of the Administrative Code, 71 P.S. § 186, and section 702(a) and 701(e)(11) of the Act, 40 P.S. §§ 1302.702(a) and 1301.701(e)(11), authorized the CAT Fund director to promulgate regulations concerning the Act. According to section 506 of the Administrative Code, heads of administrative departments, such as the CAT Fund

director, may "prescribe rules and regulations, not inconsistent with the law, for the government of their respective departments, ... the conduct of their employees and clerks, the distribution and performance of their business, and the custody, use and preservation of the records, books, documents, and property pertaining thereto." 71 P.S. § 186. Similarly, section 702(a) of the Act provided that the CAT Fund director "may promulgate rules and regulations relating to procedures for the reporting of claims to the fund." 40 P.S. § 1301.702(a) (repealed). Finally, section 701(e)(11) of the Act stated that "[t]he director shall issue rules and regulations consistent with this section regarding the establishment and operation of the fund including all procedures...." *Id.* at § 1301.701(e)(11) (repealed).

While we agree with Appellant that section 506 of the Administrative Code and section 702(a) of the Act did not vest the CAT Fund director with the power to adopt sections 242.2, 242.7(a)(2), and 242.17(d)(2), because sections 506 and 702(a) only authorize the CAT Fund director to adopt regulations addressing the internal administration of the fund and the procedure for reporting claims, we cannot agree that the CAT Fund director did not have the authority to adopt sections 242.2, 242.7(a)(2), and 242.17(d)(2) pursuant to section 701(e)(11) of the Act. As noted above, this section gave the CAT Fund director the power to adopt not only procedural regulations, but rather, any regulations "regarding the establishment and *operation of the fund* [,] including all procedures." 40 P.S. § 1301.701(e)(11) (emphasis added). Accordingly, contrary to Appellant's claims, section 701 clearly vested the CAT Fund director with authority to issue substantive regulations regarding the operation of the fund, which inarguably includes the operation of the fund under circumstances where a claim is not covered by primary insurance because the health care provider did not obtain a tail policy after his claims policy expired.

Appellant also argues, however, that even if the CAT Fund director had the authority to issue regulations concerning certain substantive issues regarding the operation of the

fund, the CAT Fund director acted outside the bounds of her authority when enacting sections 242.2, 242.7(a)(2), and 242.17(d)(2) because those sections are not consistent with the Act. *See* 40 P.S. § 1301.701(e)(11) (rules and regulations issued by the director must be consistent with section 701); *Bailey v. Zoning Bd. of Adjustment of the City of Phila.*, 569 Pa. 147, 801 A.2d 492, 500–01 (2001) ("Where an administrative agency is specifically authorized to adopt rules under a statute, the rules adopted by an agency are binding upon a reviewing court as part of the statute as long as they are (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable.") (citations omitted). Again, we disagree with Appellant.

As explained above, the General Assembly created the CAT Fund to serve as a contingency fund to pay "awards, judgments and settlements for loss or damages against a health care provider entitled to participate in the fund ... *to the extent such health care provider's share exceeds its basic coverage insurance* in effect at the time of the occurrence." 40 P.S. § 1301.701(1)(d) (emphasis added). Furthermore, the Act explicitly required health care providers to maintain a minimum level of primary insurance per occurrence and per year in order to be eligible for coverage from the fund. *See* 40 P.S. § 1301.701(a)(1). As such, the Act made crystal clear that the CAT Fund's essential purpose was to provide *excess* insurance coverage to health care providers when the provider's basic insurance coverage had been expended to its limits.[8]

**8.** We recognize that in very limited circumstances, the CAT Fund could be required to pay both basic and excess insurance coverage, but conclude that the existence of this exception only serves to highlight the fact that under ordinary circumstances, the CAT Fund was only intended to provide excess coverage. Namely, section 605 of the Act provides in pertinent part that:

> In the event that any claim is made against a health care provider subject to the provisions of [this Article] more than four years after the breach of contract or tort occurred which is filed within the statute of limitations, such claim shall be defended and paid by the fund if the fund has received a written request for indemnity and defense within 180 days of the date on which notice of the claim is given to the health care provider or his insurer.

Under these circumstances, we hold that the CAT Fund director's regulations requiring health care providers with claims policies to maintain primary insurance after the claims policies' expire by purchasing prior acts coverage are surely reasonable and consistent with the Act.

While Appellant urges us to hold otherwise, we find that requiring the CAT Fund to pay excess coverage in the absence of any underlying primary coverage would fly in the face of the Act, which plainly sought to place the burden on health care providers to maintain a certain level of primary coverage in order to qualify for CAT Fund excess coverage. *See* 40 P.S. § 1301.701(a)(1). Moreover, while Appellant correctly points out that nowhere in the Act was it explicitly required that providers purchase either occurrence policies or claims policies with accompanying tail policies, in our view, it is self-evident that in order to preserve the essentially excess character of CAT Fund coverage, primary coverage must be available either through an occurrence policy, a still-valid claims policy, or a tail or similar policy before a provider can tap the CAT Fund's resources for excess coverage. Indeed, that this is what the General Assembly intended is underscored by section 807 of the Act, which specifically required insurers who offered claims policies to guarantee the continued availability of additional insurance to health care providers after the providers' claims policies expired, no doubt to ensure that no

40 P.S. § 1301.605 (repealed). *See also Pennsylvania Medical Society Liability Ins. Co. v. Medical Professional Liability Catastrophe Fund,* 577 Pa. 87, 842 A.2d 379, 380 (2004)(CAT Fund can be made to pay both basic and excess coverage "in circumstances in which more than four years [had] passed between the events giving rise to liability on the part of a health care provider and the assertion of a claim against it.")

Notably, this limited exception is implicated in the instant case as Appellant seeks both primary and excess coverage from the CAT Fund because Mr. Paternaster filed his claim against Dr. Lee more than four years after the alleged tort. However, the fact that Mr. Paternaster's claim is a section 605 claim does not affect our analysis here as Appellant does not frame her argument that the CAT Fund can be held liable for judgments for which there is no primary coverage as one particular to section 605 claims. To the contrary, she specifically argues that the regulations set forth at 31 Pa.Code §§ 242.2, 242.7(a)(2), and 242.17(d)(2) are invalid and unenforceable in all instances, whether in the section 605 context or otherwise.

provider would be forced to forfeit his ability to obtain CAT Fund coverage upon the expiration of his claims policy. *See id.* § 1301.807.

Appellant nevertheless emphasizes that section 701(d) of the Act stated that the CAT Fund would cover claims to the extent that such claims exceeded the provider's "basic coverage *in effect at the time of occurrence,*" 40 P.S. § 1301.701(d) (emphasis added), and argues that this language demonstrates that the actual coverage available to a health care provider at the time a claim is brought is simply irrelevant to the CAT Fund's excess obligations under the Act. However, we cannot agree. Rather, reading this language in the context of the Act as a whole, we conclude that the phraseology on which Appellant relies was merely meant to convey that the CAT Fund's obligations were limited to providing excess coverage over the primary coverage that the health care provider had purchased to cover the time period in which the acts giving rise to liability occurred. We simply do not believe that, in the context of the Act, this language can be read to also convey that if the provider permitted his coverage for the relevant time period to lapse, he could still require the CAT Fund to pay excess coverage when there is no primary coverage to exceed.

In sum, given the essential character of CAT Fund coverage as excess coverage over and above available primary coverage and the Act's explicit requirement that providers maintain a certain level of primary coverage, we conclude that the CAT Fund director's regulations, which require health care providers to obtain a tail or similar policy to maintain CAT Fund coverage, *i.e.,* 31 Pa.Code §§ 242.2, 242.7(a)(2), and 242.17(d)(2), are completely consistent with the Act and were properly enacted by the CAT Fund director. *See, e.g., Lloyd v. Pennsylvania Medical Professional Liability Catastrophe Loss Fund,* 573 Pa. 114, 821 A.2d 1230 (2003). Moreover, as we hold that these regulations were validly enacted, we further conclude that, based on these regulations, the CAT Fund was not responsible for covering Mr. Paternaster's Default Judgment against Dr. Lee. *See Bailey,* 801 A.2d at 500–01

(agency regulations are binding upon a reviewing court where properly enacted).

Thus, the Commonwealth Court's order is affirmed.

Justice SAYLOR files a concurring opinion.

Justice BAER files a dissenting opinion.

## CONCURRING OPINION

Justice SAYLOR.

I concur in the majority disposition, because I believe that it comports with the Court's decision in *Dellenbaugh v. CAT Fund*, 562 Pa. 558, 756 A.2d 1172 (2000), which relieved the CAT Fund of its obligation in the nature of excess coverage in circumstances in which the health care provider had not paid the required surcharges.[1] I joined the dissent in *Dellenbaugh*, however, which emphasized that the pertinent provisions of the Health Care Services Malpractice Act did not require the result that was directed by the *Dellenbaugh* majority, and that the majority's approach was in substantial tension with one prominent purpose of the enactment, namely, to protect the interests of those injured by tortious conduct of (or breach of contract by) their health care providers. *See Dellenbaugh*, 562 Pa. at 565–69, 756 A.2d at 1176–78 (Nigro, J., dissenting). I believe that those considerations apply similarly in the present situation and, in the absence of *Dellenbaugh's* effect (which I regard as controlling), I would also assume a dissenting posture here.

1. As the CAT Fund notes, it is undisputed that, since Dr. Lee did not maintain the basic liability portion of the statutorily prescribed coverage by purchasing the necessary tail coverage, he also paid no corresponding surcharge to the Fund relative to Appellant's claim against it. *See* 40 P.S. § 1301.701(e)(1) (superseded) (prescribing for the surcharge in terms of payment by health care providers of a percentage of the cost *"for maintenance of* professional liability insurance" (emphasis added)). The CAT Fund expressly relies on *Dellenbaugh* as controlling law in such circumstances. *See* Brief of Appellee at 17–19.

### DISSENTING OPINION

Justice BAER.

I concur with the Majority's summary of the facts and the relevant law. I further agree with the Majority's conclusion that Section 506 of the Administrative Code [1] and Section 702(a) of the Health Care Services Malpractice Act (the "Act") [2] did not vest the CAT Fund director with the power to adopt the regulations found at 31 Pa.Code. §§ 242.2, 242.7(a)(2), and 242.17(d)(2) because Sections 506 of the Administrative Code and 702(a) of the Act only authorize the CAT Fund director to adopt regulations addressing the internal administration of the fund and the procedure for reporting claims. I respectfully disagree, however, with the Majority's conclusion that Section 701 of the Act vested the CAT Fund director with authority to issue substantive regulations facially inconsistent with the Act and nullifying CAT Fund liability where, as here, a claim is not covered by primary insurance because the health care provider did not obtain a tail policy after his "claims made policy" expired.

The purpose of the CAT Fund is set forth in 40 P.S. § 1301.701(d), which defines the CAT Fund as:

a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider entitled to participate in the fund ... to the extent such health care provider's share exceeds its basic coverage in effect at the time of occurrence ...

40 P.S. § 1301.701(d). Health care providers must meet two requirements to receive CAT Fund coverage. First, Section 1301.701(a) requires every provider to "insure his professional responsibility ... with an insurer ... or provide proof of self-insurance." Second, Section 1301.701(e)(1) provides "[t]he fund shall be funded by the levying of an annual surcharge ... on all health care providers entitled to participate in the fund." Thus, the CAT Fund is responsible for covering claims against

1. 71 P.S. § 186.
2. Act of October 15, 1975, P.L. 390, No. 111 (as amended 40 P.S. § 1301.701–1301.1006) (superseded).

a doctor, such as Dr. Lee, who had primary insurance and had paid all required surcharges at the time of the occurrence.

The director of the CAT Fund, however, promulgated several regulations which relieve the CAT Fund of responsibility for coverage of Appellant's default judgment against Dr. Lee. Specifically, 31 Pa.Code. §§ 242.2 states that "[i]n the case of a claims made policy ... the insurance requirements of the act require purchase of the reporting endorsement or prior acts coverage or its substantial equivalent by the health care provider, upon cancellation or termination of the claims made policy." 31 Pa.Code § 242.2. In addition, 31 Pa.Code § 242.7(a)(2) provides:

Cancellation or nonrenewal of claims made coverage ... without the purchase of the reporting endorsement, prior acts coverage or its substantial equivalent automatically releases the Fund from liability for claims for injuries or death from services which were rendered or which should have been rendered by the health care provider which occur or which are reported to the basic coverage insurance carrier after the effective date of cancellation or nonrenewal.

Id. at § 242.7(a)(2). Finally, 31 Pa.Code § 242.17(d)(2) provides:

if at the time of the occurrence the health care provider is insured on a claims made basis and thereafter fails to purchase the reporting endorsement, prior acts coverage or its substantial equivalent upon cancellation or nonrenewal of the claims made policy, and subsequently a claim is reported to the Fund under section 605 of the act (40 P.S. § 1301.605), the Fund will be relieved of its responsibility to the health care provider to defend and indemnify the claim under section 605 of the act.

31 Pa.Code § 242.17(d)(2).

Accordingly, the propriety of the Commonwealth Court's grant of summary judgment in favor of the CAT Fund turns on whether the director had the authority to enact these regulations. The Majority wrongly finds such authority in

Section 701(e)(11) of the Act, which provides "[t]he director shall issue rules and regulations consistent with this Section regarding the establishment and operation of the fund including all procedures and the levying, payment and collection of the surcharges ..." 40 P.S. § 1301.701(e)(11).

The director's mandate under Section 701(e)(11) is expressly limited to the promulgation of regulations "consistent with" the substantive portions of the statute. I do not view the director's regulations at Sections 242.2, 242.7(a)(2), and 242.17(d)(2) as being consistent with the Act. The legislature created the CAT Fund to pay "awards, judgments and settlements for loss or damages against a health care provider entitled to participate in the fund ... to the extent such health care provider's share exceeds its basic coverage insurance *in effect at the time of the occurrence.*" 40 P.S. § 1301.701(1)(d) (emphasis added). Dr. Lee's patients are entitled to the CAT Fund's protection so long as Dr. Lee had appropriate primary coverage at the time of the occurrence and had paid all of the required assessments to the CAT Fund. It is undisputed that these criteria were met. In the absence of the regulations promulgated by the director, Appellant would have been entitled to coverage by the CAT Fund. The director eliminated this entitlement by enacting regulations inconsistent with the Act, and therefore exceeded the delegation of authority found in Section 701. I would not permit the CAT Fund to avoid liability by passing regulations extrinsic to and inconsistent with the Act.

Furthermore, even if the Act provided for the delegation of substantive rule making powers, such delegation would constitute an unlawful grant of authority. Administrative agencies have the power to promulgate regulations dealing only with procedural matters, not to create substantive rights and duties. The General Assembly may delegate to an administrative agency the authority:

> to make rules and regulations to cover mere matters of detail for the implementation of a statute, but where the statute itself is lacking in essential substantive provisions the law does not permit a transfer of the power to supply

them, for the legislature cannot delegate its power to make a law.

*Ruch v. Wilhelm,* 352 Pa. 586, 43 A.2d 894, 897 (1945); *Sullivan v. DOT, Bureau of Driver Licensing,* 550 Pa. 639, 708 A.2d 481 (1998) ("[T]he Legislature may delegate policy making authority to an administrative agency, so long as the Legislature makes the 'basic policy choices' and establishes 'adequate standards which will guide and restrain the exercise of the delegated administrative functions' ").

Because I agree with Appellant that the CAT Fund may not exonerate itself from liability by adopting regulations which change the substantive rights of malpractice victims as adopted by the legislature, I would reverse the Commonwealth Court's grant of summary judgment in favor of the CAT Fund.